## LOUIS E. PRADAT *v.* A. J. RAMSEY.

1. ELECTION LAWS — THEIR DESIGN TO SECURE EXPRESSION OF POPULAR WILL — THIS DONE, THE MERE OMISSION OF STATUTORY DETAILS FOR HOLDING ELECTION WILL NOT VITIATE IT. — The entire machinery of the election laws is designed to elicit an expression of the will of the electors in the choice of officers. The fundamental principle is, that the election shall terminate according to the will of a majority or plurality of those qualified to vote, and if this has been realized, a mere omission of statutory observances, prescribing the details for conducting an election, will not vitiate it.

2. SAME — SAME — IRREGULARITIES WILL NOT VITIATE UNLESS THE RESULT DOES NOT CONFORM TO POPULAR WILL, OR THAT IS DOUBTFUL. — If the election was held at the proper time and place, and under the supervision of competent persons, mere irregularities, which concern the form of conducting it, will not avail to avoid it, unless it be shown that legal votes have been rejected, or illegal votes received, and that, because of the one or the other, or both, the result does not conform to the will of the voters, or uncertainty has been cast upon the result.

3. SAME — SAME — SAME. — No failure of duty, which is no more than an irregularity on the part of the registrars, inspectors or canvassers of the ballots, shall stand in the way of the popular verdict. When the popular will is ascertained, the design of the law is accomplished.

4. STATUTE CONSTRUED — UNDER § 391, CODE, 1871, THE QUESTION IS, WHO RECEIVED A MAJORITY OF LEGAL VOTES. — The statute, § 391, Rev. Code, 1871, seems to confine the inquiry to the question, who received a majority of legal votes ; and evidence must be directed to this point.

5. SAME — SAME — CERTAIN EVIDENCE NOT ADMISSIBLE ON THE TRIAL OF THIS ISSUE — CASE UNDER REVIEW. — Evidence that the election was conducted in a disorderly manner, and that the boxes were not kept, and the returns not made according to law, in itself is not admissible. Evidence that one of the registrars, being intoxicated, took a portion of the ballots, in a handkerchief, away from the other registrars, and did not return them until next morning, is not admissible, without showing that some of the ballots had been lost or altered, or that the plaintiff was in some manner affected thereby. Nor would it be competent to show that, at many of the precincts, many persons were permitted to vote without producing certificates of registration, and having them marked, voted.

6. THE TEST OF THE RIGHT OF CONTESTANT FOR AN OFFICE IS WHETHER A MAJORITY OF LEGAL VOTERS PREFERRED HIM. — The test of the right of a contestant for an office is whether a majority of legal voters preferred him for the office, and, therefore, as against his competitor, who received the certificate of election, he must prove that qualified votes were rejected, or illegal ballots received, which would change the result; or that such disorder and tumult prevailed, as interferred with the voting, and prevented balloting to that degree as to vitiate the election.

ERROR to the circuit court of Harrison county. SMILEY, J.:

This is a contest for the office of sheriff of Harrison county. At the general election in November, 1871,

there were four candidates for sheriff in Harrison county. The certificate of election was given to A. J. Ramsey, he having the highest number of votes, according to the returns by the inspectors of election to the board of registrars.    Louis E. Pradat filed his petition, addressed to a justice of the peace of Harrison county, in accordance with § 391, Rev. Code, 1871, claiming that he was entitled to the office on several grounds, viz.:    1. That all the registrars were democrats; 2. That but two of the registrars attended at the different places of registration; 3. That one of the registrars was a violent partizan, and not competent to be appointed, that he made democratic speeches during the contest, and influenced many persons thereby; 4. The registrars failed to erase from the books the names of voters residing in that portion of the territory of Harrison county lately attached to Jackson county; 5. The inspectors of election at one box were not sworn, as the law directs, and many persons were allowed to vote, and did vote there against petitioner without producing their certificates of registration, and who were not allowed by law to vote. The remaining grounds, numbering several, are similar to the foregoing, with the additional statement, that at some precincts the ballot boxes were not locked during the receipt of ballots, nor when the balloting closed; and that at one box, there was a wanton refusal to receive four votes for petitioner, and that aliens and non-residents of Harrison county were permitted to vote for Ramsey, and the registrars did not give legal notice of the time of making and correcting the registration; and the board of registration were not sworn according to law, etc., etc.    Ramsey was cited by the justice, and a jury cause, and a trial was had, resulting in a verdict in favor of Ramsey, as having received the highest number of votes.    From this finding Pradat appealed to the circuit court, and that court ordered that an issue be made up as to which received the highest

number of legal votes at said election. This issue was tried and a verdict rendered for Ramsey. Pradat excepted to action of the circuit court, in directing the issue to be made up as stated. A bill of exceptions was tendered, and signed, showing the evidence proposed and rejected, but as this court selected certain prominent facts proposed to be proved, and gave its opinion as to the propriety of the action of the circuit court in rejecting them, it is not deemed necessary to state the other facts proposed to be proved and rejected.

*Geo. L. Potter* and *W. P. Harris*, for plaintiff in error. But there may be frauds, etc.; the whole election may be void. What then ? The law provides for *contesting* elections *by trial*. The parties may join issue, and thus settle the matter, in court. A jury will " specify the person having the greatest number of legal votes, at such election." § 391. Here the matter is not limited to a mere count ; but every vote counted must be " legal ;" and thus, under this issue, whatever renders the vote, or all the votes, illegal, may be shown. This is also clear from the provision regarding the petition which is to be filed ; it must set forth " the grounds upon which said election is contested." § 391. There is no restriction as to "the grounds" on which the election is assailed ; and therefore, on this issue touching the question of " *legal* votes," any evidence that tends to show any one vote, or many or all the votes, not " legal," may be offered.

If the jury shall find against the party returned as elected, the justice is to issue a certificate to the prevailing party, in accordance with the verdict, and he is to be commissioned. § 391. But suppose the election was void. Then the jury must so find, for neither party could, in that case, have received a " legal " vote.

But what about the commission ? The general provision is that a commission shall be issued to the person to whom the registrars issue the certificate of election,

§ 377 ; and then, again, if his opponent gains the verdict, a certificate is to be issued, and the governor is to commission him.  § 391.  In such a case, are two commissions to be issued, one upon the certificate of election, and afterward another, upon the certified verdict ?  We say not, if the election is contested.  The general words used must be limited in view of other provisions of the law.  As the general provision for a commission to issue upon the certified verdict is plainly inapplicable during the pendency of an appeal from the verdict, so by the same rule no commission is to issue upon the registrars' certificate, in case the election is contested, until the contest is determined.  In such cases the public interests are protected under the general provisions of law that the old incumbent shall hold over until his successor is "duly qualified."  Where the election is contested, the result of the trial must declare which of the parties, if either, is entitled ; and until the suit is ended, it cannot be legally known which party, if either, has the right of office.  In such a case, the old incumbent must, necessarily, hold over during the contest.  That is to say, the right to this office being contested, and the matter pending on appeal, when these *quo warranto* proceedings were commenced, Curtis, the appointee of Gov. Alcorn, was rightfully holding over, and did not usurp the office.  His contingent term had not expired when these proceedings for *ouster* were commenced ; thus the suit must necessarily fail.  The plea of the pending contest, on appeal, was therefore a full answer to the information ; and it was error to sustain the demurrer thereto for any cause of demurrer assigned ; and the court was restricted by the code to those causes.  § 611.

But it may be replied that the code provides for two proceedings, one by *quo warranto*, and the other before a magistrate ; and the question then arises, why this seeming provision for a double remedy ?

The evident policy of the code is to avoid multipli-

city of suits. Where the state has cause to sue, by *quo warranto*, there may be contesting claimants of the office, and neither of them in possession. In such case, their claims are to be settled, if practicable, in the *quo warranto* proceeding; but where they are already contesting by suit, nothing gained by making them parties, unless the state assumes that the election was void. But, as here, one of the claimants may be the old incumbent, and the question arises, can the state charge him as usurper, because he holds over, pending the contest? We say not. Where the election is contested, no commission should be issued, but the old incumbent should hold over, and his possession is lawful. In such a case, a *quo warranto*, as for usurpation, cannot be sustained.

As this information is filed on the relation of Northrop, it is manifestly a mere private suit for his benefit, and is an attempt to try, in this form, the very matter involved in the appeal from the magistrate. It is a second edition of the same private controversy. Such a case is in no sense "a criminal proceeding." On this point the code is express. § 1504. It is only when the state proceeds of her own motion, against the incumbent, as usurper, that the suit is regarded as a criminal proceeding. In other cases, the rules of civil practice apply.

A novelty in practice was adopted in this case. The demurrer to the plea was sustained, upon the idea that the suit was "on behalf of the state," and "in form a criminal proceeding;" but when they came to the trial, the matter was regarded as wholly between the relator and Curtis. Our evidence was excluded on objection of the relator; and the verdict is for him, and not for the state There is no verdict for the state, and no issue between the state and Curtis has been yet decided.

As to the other causes of demurrer, they are frivolous. This plea was of a suit then pending, involving the elec-

tion matter, and it was immaterial to make averment as to plurality of votes. The plea was demurred to as a plea in this cause, and it was immaterial whether or not there was any suit entitled as specified in the third cause of demurrer.

It was therefore error to sustain the demurrer to the plea; but it should have been sustained to the information which does not show any approval of the alleged official bond of Northrop. This particular defect does not appear in the case of Pradat.

As we construe the statute, either party, in the proceeding before the magistrate, and on appeal therefrom, may show the invalidity of the whole election. The statute prescribes that proceeding as a proper one to investigate the question of "legal votes." If objection be raised to a particuliar vote, or votes, in that proceeding, as being illegal, the objection must be tried, for the trial is to ascertain which, if either of the parties, received " the greatest number of legal votes at such election." And if such an inquiry is the issue, it may embrace all the votes, and involve the validity of them all. And if the election was wholly void, then neither party would be entitled to a verdict and certificate, for neither would have received a " legal " vote.

But, however that may be, in the contest began before the magistrate, it is plain that, in proceedings by *quo warranto* the defendant may show the nullity of the alleged election. Such proof is relevant, as showing the relator is not entitled; and relevant also, in a case like this, against the old incumbent, as showing that no successor has been elected, and that, so the defendant does not usurp, but holds over according to law.

We now come to the evidence offered by Curtis and excluded on objection of the relator, and we say the question is simply as to the legality and relevancy of the testimony, and not as to its weight or conclusiveness before the jury. If the evidence was legal and perti-

nent to the issue, it should have been admitted; and then it would have been for the jury, and not the court, to decide whether it proved the invalidity of the election.  If the evidence offered tended to prove the illegality of the election, or of any vote or votes, it should have been admitted, " although this proof alone might not have been sufficient, it was nevertheless competent," and it was therefore error to exclude it.  Dejarnett v. Haynes, 23 Miss. Rep. 603; Phillips v. Burrus, 13, S. & M. 39.

The court cannot prejudge the question of fact, and, assuming that a party cannot make good his case, exclude all his evidence.

Nor can this court assume that defendant would not have added still stronger proofs, if the excluded evidence had been admitted.

For example, was it not competent for Curtis to show, as he offered to prove, that, at several precincts, " the boxes were not kept, and the returns were not made according to law " ?

The relator relied on his certificate, and the commission is as of course upon it, and now, here was a legal scrutiny of the validity of those documents.  Might not the defendant show that " the returns were not made according to law " ?  Could the court, without hearing the proof, assume that returns, " not made according to law," were legal returns, and proper to be counted; was it legal for the court, in its haste, to " make an end of controversy," to compel the jury to " go it blind," and decide the case on the mere certificate of election ?

Again, was it immaterial to show that, on return of the precinct boxes, an intoxicated registrar, in violation of law, bundled " a portion of the ballots in a handkerchief," and took them away, and did not pretend to return them until the next day?  It may be that this " irregularity " would not necessarily avoid the election —that it might have shown that all the votes thus

taken were carefully kept, unchanged, and returned and counted. But the fact of such a taking away being proved, the burden of proof would be on the plaintiff to show that even such an act did not affect the election.

So where it is shown, as offered by Curtis, that none of the clerks or inspectors were sworn, it devolves on the plaintiff to prove that the unsworn persons acted faithfully, as if sworn.

Again, Curtis offered to show that all the certificates of election were illegal, and gave no right to vote, not being signed by a registrar, but only by the clerk of the board. Grant that such a signing may be explained and shown to be good, the question is, were they *prima facie* legal; and so conclusively legal, that Curtis might not, as he offered to do, prove them invalid?

Furthermore, Curtis offered to prove that the election was "for the reasons aforesaid, illegal and void," but the court refused him the privilege. That is, he offered to prove that these "irregularities" were not harmless, but that they occurred under such circumstances as to invalidate the election.

Votes received without preliminary proof are illegal. Lead. Cas. Elect. 558, 492.

*Yergers & Nugent,* for defendant in error.

The variety of reasons set up in the petition, why the petitioner was the sheriff elect of Harrison county, are wholly foreign to the issue really to be inquired into. The simple question was that fixed by the circuit court: Did Ramsey receive the greatest number of legal votes at the election on the 7th day of November, 1871, held in Harrison county? Rev. Code, 1871, § 391. If he did, there was an end to the matter in this case. It was not in the power of the magistrate to inquire into the sufficiency of the registration; the illegalities attending the election; the impropriety of excluding some votes, and accepting others; or the politics of the several re-

gistrars. He had but one issue to try, and that was done *secundum strictissimi juris.* If the statement made be true, the election and registration was both very badly conducted, and upon a proper proceeding might have entitled the petitioner to such relief as ought to have been given. If the election had been fraudulent, it could doubtless have been set aside, and a new election had; but a justice of the peace has no such power given him by the code, and if he had, it is questionable if the act granting the power would have been constitutional. Chapter six of the Rev. Code of 1871, and article XIV, of chapter fifty-eight, same code, are conclusive upon the subject of elections, and expressly negative the idea that a justice of the peace can possibly have the large power contended for. It is manifest that the jurisdiction conferred, to try who received the greatest number of legal votes cast at the election, was given under sec. 24, art. 6, of the constitution, and is to be expressly limited to that. The same issue was presented to and tried by the circuit court. The only point is : Did Ramsey or Pradat receive the greatest number of legal votes at the election ? It is not as to how the registration was conducted, or how the election was managed, or how many democrats were on the board, or anything else. If votes were rejected that ought to have been received, that presents a question to be decided in another form, and by a far different proceeding. People v. Cook, Bright. Lead. Cas. Elect. 423.

Ramsey received his certificate of election from the registrars ; he has twice, by the verdict of a jury, been decided to be the sheriff of Harrison county, and should be inducted into his office without further delay.

SIMRALL, J. :

The remedy for the contestation of the election of state and county officers is given by statute. Section 391 of the Code of 1871, applies to the case of county

officers.   The terms are, that the contestant shall file a
petition before a justice of the peace, setting forth the
grounds upon which the election is contested.   Upon
notice to the adversary, the justice shall cause an
issue to be made up, and tried by a jury, and the verdict
of the jury shall specify the name of the person having
the greatest number of legal votes.   If the verdict is
against the person returned as elected, the justice shall
issue a certificate, and he shall be commissioned by the
governor.

The appeal to the circuit court, is to be tried *de novo*,
and is not limited to a mere review of the proceedings
before the justice of the peace.   In passing judicially
upon questions arising under the election laws, it has
not been overlooked by the courts, that their entire
machinery is to elicit an expression of the will of the
electors, in the choice of officers.   The duties imposed
by these statutes are very often committed to men, (it
may be said, is so, generally,) unlearned in the law, and
unpracticed in business.   Mistakes and irregularities
will sometimes occur, and failure in a strict literal com-
pliance should not surprise, much less vitiate the elec-
tion, unless something so vital has been pretermitted,
or some wrong so gross and palpable has been perpe-
trated, as to defeat the popular voice, and deprive a
candidate of a substantial right.   Such statutes ought
to be interpreted with liberality, as providing a mode
to ascertain the choice of the electors, as directing
machinery to bring out and ascertain the vote.   Nor
should such omission of forms prescribed, or any irregu-
larities on the part of those conducting the election, in-
validate it, unless the effect has been to stand in the
way of, and defeat, the popular preference, or the pro-
duction of satisfactory evidence of it.   Judges do not
overlook the fact, which is of common observation, that
election day is often a time of excitement, induced by
the great interest involved, the busy solicitations of

candidates and their friends for suffrages; the arts and schemes to influence votes; the tension to which the sentiments and occasionally the passions of men are aroused, by the magnitude and importance of an issue, to be decided in a few hours of time. And, therefore, they accept the ordinary experience and reason, as supplying the tests, by which such occasions are to be judged of. They will not construe the overzeal of candidates and their special friends for success; the conflict of opinion and preference, sometimes culminating in a breach of the peace, as such intimidation and violence that would necessarily avoid the election. ( The fundamental principle to which the judiciary look, is whether the election has had a termination, according to the will of a plurality, or majority of those qualified to vote.

Irregularities of the officers of election, such as not being properly sworn, not being *de jure* appointed, or qualified, having no other right than being *de facto* incumbents, a failure to appoint subordinate assistants, such as a clerk, securing votes, after the outer door of the room had been closed, from those who remained within, (voters not being thereby deprived of their rights,) or other failure to follow the law, will not vitiate the election. The people who are electors, should not be deprived of the benefit of their votes, because those whose duty it was to hold the election, were ignorant, incompetent, or wilfully failed in some particulars to do their duty. (Nor should the successful candidate lose his office, because of the misconduct of these officials, if he is free from complicity with them, and has not gained the office by reason of such misbehavior.

If the election was held at the proper time and place, and under the supervision of competent persons, irregularities which concern merely the form of conducting it will not avail; it must be shown that legal votes have been rejected, or illegal votes have been received, and

that because of the one or the other, or both, the result does not conform to the will of the voters, or uncertainty has been cast upon the result. People v. Cook, 14 Barb. 259; 8 N. Y. 67; People v. Bates, 11 Mich. 363.

If the objection be that one of the inspectors was disqualified (as being a candidate), and the others are qualified, this is sufficient. People v. McManus, 34 Barb. 620. Nor is the objection good that the ballot-box has not been locked and sealed as prescribed by the statute. People v. Higgins, 3 Mich. 233.

Some designated persons must, at the time, determine as to the qualifications of those who offer to vote. Many of them will be unversed in the law, taken from the ordinary, non-professional occupations of life. Errors of judgment, in the rejection of legal votes, and the acceptance of illegal ones, may be expected, and would occasion no surprise. The common judgment of men would concur, that for such errors the election should not be set aside, unless upon their rectification a different result would be obtained. Such, under various states of case, has been the concurring judgment of the courts. Ex parte Murphy, 7 Cow. 153; Parish of Ludbery v. Stearns, 21 Pick. 148; People v. Cicotte, 16 Mich. 283. So, too, if the objection be that violence and intimidation was displayed at the polls, it must be of so serious a character as to intimidate legal voters, and interrupt and prevent their voting. The freedom of the election must be broken up. A casual affray, a riot suddenly occurring of temporary duration, are not a valid objection, if there was, notwithstanding, an opportunity to the electors to cast their ballots. 21 Pick., 148, *supra*. Such disturbances must go to the extent of infringing upon the freedom of choice, and defeating the popular will. Therefore a failure of election in one precinct for such cause, or such disorder and violence as would prevent the returns from a particular

precinct, would not vitiate, unless it could be shown that if the poll had been opened and the election had, on the return made, a different result would have been reached. Ex parte Heath, 3 Hill, 42; 21 Pick. 148. It is impossible to consult the adjudications upon the delicate subject of the contestation for offices determinable by popular election, without securing a strong impression of the practical wisdom upon which the judgments repose. The law is framed to the end, that every elector, however humble, may vote according to his will; so that the result may be the fair and free manifestation of the aggregate will of the majority, or plurality of the electors. Therefore those designated to hold and superintend the election, are, for the occasion, by law, conservators of the peace, and authorized and specially instructed to preserve order, and arrest all disturbers of the peace. No failure of duty, which is no more than an irregularity, on the part of registrars, inspectors, or canvassers of the ballots, shall stand in the way of the popular verdict. (The substantive thing, designed by the law, is to ascertain the popular will; when that has been pronounced, its purpose has been accomplished. These elections bring out the community; the good and the bad, the orderly and the disorderly, commingle in close contact. The occasion is availed of sometimes by the lawless, for sinister and wicked purposes, to create disorder and tumults. It may be the wise policy, to turn over these brawlers and disturbers of the public peace, to be tried and punished by the criminal laws, rather than to make it the occasion of calling in question the validity of the election. Nor should it be allowed to work that great mischief, unless it appears that legal voters were deprived of their suffrage; and that to the degree of bringing into doubt the freedom of the election, so that the popular will has probably failed.

The statute requires that the specifie grounds of objection to the election shall be stated. It will not suf-

fice to state general objections, as that it was illegal, or fraudulently conducted; the particulars must be set out.

It is said that it was error to rule out the testimony offered on the trial. If it was relevant, and tended to prove the issue for the contestant, it was so. The court ought not to control the order of the adduction of testimony. But if the matter offered went merely to prove an irregularity in the registrars, inspectors, or canvassers, some omission to follow the letter of the law, in a matter directory merely, its admission would in no wise help the contestant. It was incumbent on him, in order to overcome the *prima facie* case, which the certificate of the canvassers of the ballots created, to show that illegal votes were given to Ramsey, or legal votes excluded from himself, or some other reason, which would establish that he was entitled to the office. The conduct of the canvasser, who withdrew for a time some of the ballots from the box, was most reprehensible and disgraceful. If the offer had been to prove, that whilst thus in his possession, they were altered to the contestants prejudice, or otherwise tampered with, lost or destroyed, to his injury, the testimony would have been admissible.

The statute seems to confine the inquiry to the question of who received a majority of legal votes. The testimony offered would not, nor would all of it, prove that issue for the plaintiff in error. Without referring to each several offer of testimony, we remark, only on those which have the most semblance of relevancy. The second was testimony on the point "that the election was conducted in a disorderly manner, and the boxes were not kept, and the returns were not made, according to law." It was not suggested that the disorder prevented any man from voting, by whom it was created, or in what it consisted. The election may have been conducted in a disorderly manner, and yet its purity and freedom not necessarily be infringed upon. It was not

proposed to prove in what particular the law was departed from in keeping the boxes, nor in what the returns did not conform to law.

Third. It was offered to be proved that one of the registrars, being intoxicated, took a portion of the ballots in a handkerchief, away from the other registrars, and did not return them until next morning. That did not tend to prove that the plaintiff was entitled to the office; because it fell short of showing that any of the ballots had been lost or altered, or that the plaintiff was injured thereby, more than any other candidate, or that he was affected thereby in any manner. It was not pretended that the registrar, thus shamefully misbehaving, was instigated by the motive to defraud the plaintiff of his election. It would rather seem to be a drunken, meaningless freak, not specially referrible to one candidate more than another.

The fourth offer was, " that at many of the precincts, many persons were permitted to vote without producing certificates of registration, and that the certificates were not marked ' voted.' " To this it may be answered that it was not indicated for whom these persons voted, or by purging them out, the plaintiff would have had the " most legal votes." But is the proposition of illegality true ? Section 373 of the election law, Code of 1871, is: " Registration shall in all cases be *prima facie* evidence of the right to vote, and on the day of election no person shall be challenged in his right to vote, (at the polls,) except for identity."

The theory of the plaintiff was, that omissions and irregularities, and errors of judgment by those charged with registration, holding the election, and canvassing the ballots, would make the election illegal, and demonstrate that Ramsey had no title to the office. Hence his several offers to make proof on these points, the circuit court disagreed with him, and ruled that the test of his right under the issue was, whether a majority

of legal votes preferred him for the office, and therefore he must prove that qualified voters were rejected, and illegal ballots received, which would change the result. Also, that such disorder and tumult prevailed as interfered with the voting, and prevented balloting to that degree as to vitiate the election. That the errors, irregularities, etc., on the part of the officers, did not make the election void, and could not have the effect of vitiating the choice made by the electors. We think the views of the circuit judge were substantially correct, and affirm the judgment.