HARRIS *v.* STEWART.

(In Banc. Jan. 29, 1940.)

[193 So. 339. No. 34014.]

**K. G. Rayburn** and **J. B. Fontaine**, both of Pontotoc, and **Adams & Long**, of Tupelo, for appellant.

Fred B. Smith, of Ripley, and W. H. Inzer and B. A. Jaggers, both of Pontotoc, for appellee.

**Griffith, J.**, delivered the opinion of the court.

In the second Democratic primary election for nomination for the office of supervisor of the fifth district of Pontotoc County, Harris, appellant, and Stewart, appellee, were the two candidates, the date of the primary being August 29, 1939. On the next day, August 30, 1939, the county executive committee met and upon a canvass of the returns declared that Harris had been selected as the nominee by a vote of 389 for Harris, and 380 for Stewart. Having reasons to suspect the material irregularities hereinafter more fully mentioned, Stewart gave notice within the time and in the manner provided by Section 7, Chap. 19, Laws 1935, Ex. Sess. (commonly called the Corrupt Practices Act), that he would avail of the right of a full examination of the ballot boxes of said district and their contents, which examination was made on September 13, 1939. This examination disclosed that at the Beckham voting precinct in the district, 21 votes were allowed to be cast by persons who were not qualified electors, and that at the Algoma precinct 10 illegal votes

were cast, a total of 31 illegal votes, whereas the majority for Harris, on the face of the returns, was only 9. The examination disclosed that these irregularities went so far as that at the Beckham box three persons were allowed to vote when there were no such persons known or registered in the district by the names which appeared on the list of those who voted—and it is of some significance to note that the Beckham box was the only one at which appellant Harris received an apparent majority.

Thereafter, on the 16th day of September, 1939, Stewart filed his contest with the county executive committee in which, in writing, he specified all the requisite facts in regard to the said 31 illegal votes, including a bill of particulars which gave the name or assumed name of each and every one of the 31 illegal voters, and opposite each name gave the reason or reasons why the person so named was not a qualified voter. The petition stated the total vote for each candidate, and showed that, since the difference in the total vote as between the two candidates was only 9, the intrusion of the 31 illegal votes included in the count made it impossible to dependably know who was in fact the choice of the legal voters of the district; and the contestant prayed that a new primary be ordered for said office in said district in which the said illegal voters would be denied participation.

Due and proper notice was given of this contest, and it was asked in the contest-petition that the executive committee convene and hear the matter on September 30, 1939. The committee delayed, however, until October 6, 1939, when, without any hearing of the contest on its merits, the committee dismissed the contest, although the contestee admitted, on his motion to dismiss, that illegal votes were cast at said election as alleged in the contest-petition.

Whereupon, and on October 13, 1939, Stewart filed his bond and petition for a judicial review, and on October 17, 1939, the Chief Justice designated Honorable T. H. McElroy, circuit judge of another district, to hear and

determine the matter, and the circuit judge fixed the date for the hearing for October 25, 1939. For the reason hereinafter to be stated, Stewart, on the date last mentioned, took a voluntary nonsuit, and paid the costs; but on the same day filed another petition with bond and with the proper certificate of two practicing attorneys, the said petition for a judicial review being in similar words and figures as compared with the original petition, but with additional averments by way of explanation and in avoidance of the delay brought about by the voluntary dismissal of the original petition.

On October 26, 1939, the Chief Justice designated the same circuit judge to hear and determine the matters presented by the second petition, and on October 27, 1939, the circuit judge set the cause for hearing on the first day of November 1939, at the county courthouse of Pontotoc County. All notices were promptly and properly given as required by the aforesaid Act, and the parties and their attorneys were present at the said time and place. Appellant Harris did not file an answer to the petition, but demurred thereto and on the overruling of the demurrer. Harris declined to plead further; wherefore all the averments of the petition properly pleaded are to be taken as true—in view of the concluding lines of Subsection (b); Sec. 15, c. 19, Laws 1935, Ex. Sess.

In addition to the demurrer appellant has moved to dismiss the petition, assigning several grounds for such requested action. We shall take up the grounds presented by the motion and by the demurrer, and dispose of them not in the order of their presentation, but in such order as they may best be dealt with here.

1. It is contended that the Act allows but one petition for a judicial review and that when one has been filed and voluntarily nonsuited, another cannot be presented. In an Act such as the statute we have now before us, it would be impracticable, if not impossible, to deal with every detail which might arise in the course of its administration. In matters of practice and procedure un-

der such an Act, and in respect to which the Act itself is silent, there will be applied the usual rules of procedure which prevail as regards other cases, and therefore Sections 594 and 595, Code of 1930, and the established practice thereunder, will apply to a petition such as this, as well as to any other action in a court, in the matter of voluntary dismissals without prejudice.

2. As a corollary of the foregoing contention, appellant says that when the Chief Justice has once designated a superior judge of another district to hear a contest of this nature, the Chief Justice is without power to make a second designation of a judge to hear the same matter. As already indicated, when a voluntary nonsuit has been taken and the costs are paid, the nonsuited petition stands as if never having been in court at all, and hence it furnishes no obstacle to the statutory procedure on a second petition, and her consequence if the second petition has been filed in time, it is the duty of the Chief Justice and the designated superior judge to proceed upon the second petition.

3. For another ground for dismissal of the present petition, appellant says that it was not filed within the time allowed by the statute, which in Section 15 requires that such a petition shall be filed forthwith after the executive committee has failed or declined or unreasonably delayed to grant the relief prayed in the contest before the committee. As already shown in the statement of the facts, the executive committee denied the contest on October 6, 1939, and the present petition for a judicial review was filed on October 25, 1939, which, as appellant contends, was not forthwith.

An examination of the provisions of the Act under consideration will disclose the purpose that the proceedings preliminary to and during the course of a judicial review of a primary election contest shall be conducted with such diligence, expedition, and dispatch as will enable the trial court to have a full and orderly hearing and to conclude it in such time that, if practicably possible, a

new primary, if ordered, may be held before the day of the general election in November of the same year. The requirement that the petition shall be filed "forthwith" is on in pursuance of the aforesaid object; and if the hearing is actually had on such a petition and as a result thereof, a new primary has been ordered and held before the general election, as was done here, the statute has been satisfied in the particular case although the petition was filed as late as October 25, 1939, and when the general election was to be held November 7, 1939.

While it actually turned out in the present case that the petition was filed in time, we wish it to be understood that we are dealing with the facts of a particular case, the one here before us, and that we are not committing ourselves to the holding that in any and every case the filing of such a petition so late as October 25th after a primary on August 29th, or thereabout, will be held to be within the requirement of a filing "forthwith."

On the other hand, it is not to be understood from anything that is said in this opinion that we are indicating that even though the petition is filed forthwith and is prosecuted with all reasonable diligence, relief is to be denied unless a judgment is obtained before the date of the general election. See, for instance, Hayes v. Abney (Miss.), 188 So. 533, 535. The term "forthwith" is a relative one and means within such time as to permit that which is to be done to be done lawfully and orderly and effectually according to the practical and ordinary course of the thing or things to be performed or accomplished; and it is, therefore, not to be used by way of a penalty when accidental interventions or difficulties of which the party is not to be charged with foresight, have upset what otherwise would have been reasonable calculations as to the available time. It is significant that the Act fixes a specific time within which most of the steps mentioned therein are required to be taken, but as to this step uses the word "forthwith," thereby recognizing that in this particular the fixing of a precise time limi-

tation would be unwise, and that rather the circumstances of each particular case should govern,—although requiring all reasonable diligence and dispatch, yet this shall be in view of all the facts and circumstances with which the party has been encumbered.

4. When appellee's original petition for a judicial review was filed on October 13, 1939, the jurisdictional certificate by two practicing attorneys that they had made an independent investigation was signed by the employed attorneys representing the contestant. On October 23, 1939, in Pittman v. Forbes, 191 So. 490, this Court announced its decision that attorneys so employed were not within the terms of the statute which requires a certificate made by attorneys who were without the partisan bias of such employment. It was on account of this decision that appellee took his voluntary nonsuit of his first petition on October 25, 1939.

Appellee then requested two practicing attorneys, who were not and had not been employed by him or by any person in his behalf, and who were not prospectively to be employed, to make the independent investigation required by the statute as a prerequisite to the filing of any such a petition. The two attorneys so requested did immediately make the investigation and delivered their certificate containing the requisite findings, and it was upon this certificate that the second petition was filed, the certificate being annexed thereto.

The contention now is that one of these two attorneys last mentioned was not impartial or unbiased. It is said that he has an office on the same floor with one of the attorneys for appellee, and that he and the attorney for appellee, while not partners, are intimate friends, and are often associated together in cases. This did not disqualify the certifying attorney. The only facts which would disqualify a certifying attorney are: Employment of the attorney, past, present, contingent or prospective, by or for the contestant as his attorney in respect to the

matter involved in the contest, or such facts as would disqualify a judge under Section 165, Constitution 1890.

5. Appellant contends further that he should have been allowed to show, and he offered to attempt to show, that the certifying attorneys did not make the full investigation into the facts which the statute contemplates. The trial judge correctly refused to permit inquiry into this question. The statute (Sec. 15) in requiring as a jurisdictional prerequisite that a "petition for a judicial review shall not be filed unless it bear the certificate of two practicing attorneys that they and each of them have fully made an independent investigation into the matters of facts and of law upon which the protest and petition are based and that after such investigation they verily believe that the said protest and petition should be sustained and that the relief therein prayed should be granted," had in mind these facts:—

That primary election campaigns often engender unreasonable animosities among candidates and their partisans, especially as regards local and county candidates, and that these animosities lead to unreasonable and unfounded charges of wrongful conduct, and that they will continue in intensity for some time after the election is over. That candidates who, upon the face of the returns, are shown to have been defeated, burning sometimes with a conviction of blame to be placed somewhere, will too often be overready to charge election frauds, and, if having the means to do so, will employ attorneys to make contests, who when so employed may soon possess, to a large extent, the bias and partisan interest which has impelled the client. That thereupon unmeritorious court contests would be prosecuted against nominees who have no large purses and wherein the offices to which they have been nominated pay no more, or but little more, than a living salary or compensation.

To guard against this, the State, by this provision in the Statute, called upon the patriotism and fidelity of its practicing attorneys, and requested them and each of

them in the interest of fairness, and of good government, to make these investigations, without pay or hope of pay except by the gratitude of the State itself; and to certify the truth of their investigations in each one of these proposed court contests. Every practicing attorney in the state was made a quasi-judicial officer to determine whether a proposed judicial hearing upon a primary election contest should be allowed and until the quoted statutory certificate is obtained from two of them, no such contest shall be instituted in the courts. And being quasi-judicial officers in respect to such an investigation, only that which would disqualify a judge will disqualify the certifying attorney; and a collateral inquiry as to how he made his investigation or how fully he made it can no more be permitted than it could be questioned of a judge that he failed to attend to the evidence and had not studied the law applicable to the case.

As already indicated, the evident and material purpose of the requirement of the certificate of two independent practicing attorneys was to prevent, or at least to minimize, the bringing before the courts of captious or unsubstantial political contests of primary elections—that such a certificate would dependently show that there was real merit from a substantial legal standpoint in the proposed contest, and would tend to forestall, in a large measure, spiteful partisan litigation which would needlessly cast doubt upon the future title of the successful candidate to the nomination for the public office involved. And in this call by the State upon the patriotism and fidelity of its practicing attorneys, it was considered that they and each of them would be sensible to the object of the trust reposed in them, and would be seriously responsible thereto, and it was never supposed that one of these, qualified to furnish such a certificate, would ever be put on trial or subjected to inquiry as to the manner by which he made it. If such were allowed, it might and perhaps would happen that attorneys would hesitate or

refuse to make .the investigation however gross the wrongs perpetrated in a primary.

6. Appellant complains that the petition for a judicial review contains much by way of averment that was not included in the original contest before the executive committee. It is true that as a predicate to a petition for a judicial review the contestant must first file his contest with and before the county executive committee, and as said in Shaw v. Burnham (Miss.), 191 So. 484, 486, "his contest or petition or complaint before the Executive Committee shall be. reasonably specific in its charges and not in mere general language." But when he has complied with this requirement, and although his petition for a judicial review must not assign any new or additional cause of action, it may be both amendatory of the causes of action or grounds for relief, as preferred before the executive committee, and supplementary as to all those material facts which happened during and since the hearing before the executive committee. And as to the amendatory features, the rule is the same as that. which is stated in Illinois Cent. R. Co. v. Wales, 177 Miss. 875, 889, 171 So. 536, 539, as follows: "When the main facts are set out in the original pleading, and an amendment is made which merely elaborates upon those facts and sets forth additional incidental facts not changing the original picture presented, although those incidental facts may be necessary, in point of strict law, to the statement of a good cause of ·action; the amendment introduces no new cause."

In the present case the petition before the executive committee and the petition for a judicial review were, in contents and terms, within the rules stated in the foregoing paragraph.

7. The final and the most important contention made by appellant is that the contestant did not allege in his contest-petition before the executive committee that any one or more of the illegal votes were cast and· counted for appellant, and that so far as anything to the .contrary

appears in the petition every illegal vote may have been cast and counted for the contestant. In other words, that the burden both of allegation and of proof was on the contestant to show that enough of the illegal votes were actually cast for the contestee to give him the apparent, although not real, majority. In support of this contention, appellant relies upon some of the expressions found in the opinions in the recent case, Hickman v. Switzer (Miss.), 191 So. 486, and in the early cases, Pradat v. Ramsey, 47 Miss. 24; Word v. Sykes, 61 Miss. 649, while appellee relies upon the recent case more directly in point, of Hayes v. Abney (Miss.), 188 So. 533, 535, and upon the express language of Sections 4 and 5 of the Act itself (Chap. 19, Laws 1935, Ex. Sess.).

It would appear that the decisions of the various courts which have dealt with this question, most of them long before the introduction of the Australian ballot, may be grouped into three divisions: (1) Those holding that when it appears that enough illegal votes have been cast to change the result, no award may be made to either candidate, for the reason that such an award would have to be based upon conjecture as to the person receiving the illegal votes or as to how many of such illegal votes each received, thus bringing into operation the familiar principle that no award may be made or judgment rendered upon conjecture or mere guess. (2) Those that hold that such an election is not void, but that when the contestant has shown that enough illegal votes have been cast to change the result, the burden then shifts to the contestee to show that he received the majority of the legal votes; and (3) those that hold that the election is not void, and that the contestant has the burden of showing not only that enough illegal votes have been cast to change the result, but further that the illegal votes were not cast for the contestant. It is for the rule at last stated that appellant contends here.

Appellant admits that under our present statute, Section 6245, Code 1930, which has existed in our laws since

the adoption of Section 16 of the election ordinance by the Constitutional Conveyance of 1890, and which requires secrecy in ballots, the legal voter cannot be required anywhere, even in court, to reveal how he voted. But appellant says that this does not apply to the illegal voter, and that the burden was on the contestant to summon in these 31 illegal voters and make them tell how they voted. But Section 873, Code 1930, in which connection see Section 5864, Code 1930, makes it a criminal offense on the part of "any person who shall vote at any election, not being legally qualified . . ." Therefore, when the illegal voter is put on the stand and questioned, he could at once invoke the constitutional privilege against self incrimination and refuse to testify at all (Const. 1890, section 26); and the contestee would have a poor lawyer who would fail to let these illegal voters know of their constitutional right so to refuse to testify. What appellant proposes here is that when a contestant has averred and proved, or it is admitted, that a flock of illegal votes has been allowed in the election and asks for the bread of relief, he shall be given a stone.

But the cited sections of the Act under consideration, expressly cover such situation. Sections 4 and 5 deal in detail with what is to be done at the polls, at the counting and of the manner of making the returns, all to the end that an honest and qualified vote may be taken and honestly counted and returned. Near the beginning of Section 4, it is enacted: "When any person entitled to vote shall appear to vote, he shall first sign his name in a receipt book or booklet . . . whereupon and not before, the initialing manager shall endorse his initials on the back of an official blank ballot . . . and when so endorsed he shall deliver it to the voter . . ." When this statute says that a ballot shall be allowed to a person entitled to vote, it means that a ballot shall not be given to a person not entitled to vote; and we suppose that none would contend that allowing persons to vote

who are not qualified is other than a failure in a material particular to comply with that section of the Act.

And Section 5 provides as follows: "And when the said box is opened and examined by the county executive committee and it is found that there have been failures in material particulars to comply with the requirements of this and the next foregoing section to such an extent that it is impossible to arrive at the will of the voters at such precinct the entire box may be thrown out . . . Or the executive committee, or the court upon review, may order another primary election to be held at that box within five days from the date of the order, appointing new managers to hold the same." There is the mandate of the statute as to what an executive committee shall do when it is shown to the committee that 31 illegal votes have been cast and counted at two boxes and there is a difference of only 9 votes in all the boxes between the two candidates; and that mandate is that they shall either throw out the challenged boxes or order another primary election so far as concerns the office brought into question.

In most cases it would be too harsh a remedy to order an entire box thrown out; and this, perhaps, should not be done unless the candidate whose apparent majority has been procured at that box has been an active participant, either himself or through others with his knowledge and approval, in the frauds and irregularities therein, or where the communities represented by the challenged boxes have so long and persistently indulged in election frauds and irregularities that no other means, more effectual to make them know that the policy of the State is against such wrongs, is to be found than to throw out their illegal and fraudulent boxes.

In connection with what has last been said, it is interesting to observe that the petition avers, and it is not denied, that for many years it had been the practice and custom in some parts of the county mentioned to tolerate and indulge in the illegalities of allowing disquali-

fied persons to vote as was done in the election now challenged, and that in spite of the definitely advanced policy of the State in this regard, it became known that numerous violations of the election laws had prevailed in the county at the first primary on August 8, 1939. That because of this and in the effort to prevent a recurrence thereof at the second primary, a mass meeting was called and was held in the county at which a representative of the District Attorney addressed the people, and that at another public meeting the Secretary of the County Democratic Executive Committee made an address advising the several election managers as to their duty to exclude persons not entitled to vote, yet with all this, the petition further avers, that the managers at the two challenged boxes not only knowingly permitted these disqualified persons to vote in the second primary on August 29, 1939, but actually encouraged them to come to vote, assuring them in advance that their illegal votes would be received and counted.

The sole exception to the requirement of the statute that the challenged box or boxes shall either be thrown out or another election ordered is found in that provision in Section 5 of the Act which falls in the place where there are asterisks in the quotation from that section in the third next preceding paragraph of this opinion. Sometimes it happens that it is known that a certain candidate will receive a large vote at a certain box, enough in all probability to give him a majority for the office he seeks. The managers at that box may happen to be strongly opposed to that candidate, and so strongly opposed that they will resort to any means to defeat him, among which would be to so manipulate the box and the holding of the election thereat as to infect it with every possible irregularity with the deliberate purpose of having it thrown out on account of such irregularities. When such a state of facts appears the committee must not throw out the box if it can be in any available way avoided, but "shall conduct such hearing and make such

determination in respect to said box as may be lawful and just,'' subject to a judicial review thereof as in other cases. The exception mentioned in this paragraph is not within the facts presented in the present case, and we have referred to it for the purpose only of more clearly disclosing that it has nothing to do with what should have been ordered in the case here before us.

And the court did here what, in the judgment of the court, the executive committee should have done, to-wit, it ordered another primary to be held within five days from the date of the order, and appointed managers to hold the same—the date fixed for the other primary being within a time that would allow the nominee thereat to get on the ticket for the regular election on November 7, 1939. We will note here that the court ordered another primary not only at the two offending boxes, but at all four of the boxes of the district. No point is made as to this, and we express no opinion whether the primary ordered should have been only at the two challenged boxes or at all four within the district. It may be that the parties agreed that if the primary was to be ordered by the court it should be at all the boxes, and it may be in the particular situation that this was the fair and proper thing to do.

There is no error in the record, and the judgment is affirmed.

Affirmed.