350 So.2d 998 (1977)
Harl O'NEAL
v.
Mrs. T.C. SIMPSON.
No. 50068.
Supreme Court of Mississippi.
August 31, 1977.
Rehearing Denied November 2, 1977.
*999 Dulaney & Dulaney, J.W. Dulaney, Jr., William P. Dulaney, Tunica, for appellant.
Sullivan, Smith, Hunt & Vickery, David R. Hunt, Clarksdale, for appellee.
EN BANC.
SUGG, Justice, for the Court:
This appeal arises from a contest of the general election of November 4, 1975 filed by Harl O'Neal, the Democratic nominee for the office of Supervisor, District No. 1, Quitman County. Mrs. T.C. Simpson qualified as an independent candidate in the general election following the defeat of her husband, who was the incumbent supervisor, by O'Neal in the Democratic primary. Mrs. Simpson was declared the winner by a margin of twelve (12) votes out of nine hundred forty-two (942) votes cast and was certified to the Secretary of State by the Quitman County Election Commission as such. She has occupied the office of Supervisor since January, 1976.
Appellant filed his petition under Mississippi Code Annotated section 23-5-187 (1972). The first trial resulted in a mistrial and in the second trial the jury found that Mrs. Simpson received the greater number of legal ballots cast.
On the day before the general election of November 4, 1975, Mrs. Simpson gave written authority to Mrs. Elizabeth Daniels and Mrs. Fannie Smith (hereinafter called poll watchers) to act on her behalf at the Darling voting precinct. Mrs. Simpson testified that, although she appointed poll watchers, she had no reason to distrust the election officials, managers, clerks or bailiffs and admitted that she appointed the poll watchers to support her candidacy. The poll watchers did not challenge a single voter throughout the voting.
The poll watchers assisted approximately one hundred persons out of three hundred fifth nine votes cast at the Darling precinct. At the beginning of the voting a manager *1000 of the election noticed one of the poll watchers inside a voting booth with a voter. The manager asked the poll watcher to step outside the booth while the managers ascertained whether the assistance was proper. After a conference the managers concluded that the assistance was proper. One of the managers at the Darling precinct testified:
The way the rule was interpreted to us, that anyone that wanted help could ask anyone to go to the booth and help them vote. And that was the way the thing was interpreted to us and that's the way it went all day.
The poll watchers were permitted to assist voters throughout the day and did not at any time disobey the managers and conducted themselves in an orderly fashion.
The managers of the election did not make any effort to determine if voters were entitled to assistance under applicable Mississippi statutes. To the contrary the managers were under the belief that any person who desired assistance could receive it. With the exception of one or two voters who were blind or disabled and the voters who announced that they were unable to read, most of the voters who received assistance by the poll watchers were permitted to have assistance without declaring to the managers that they were blind, physically disabled or unable to read. The record shows that twenty-one voters were apparently unable to write because their names were written by a clerk who had the voters place an X after their names.
Out of three hundred fifty nine votes cast in the Darling precinct, Mrs. Simpson received two hundred thirty-three and O'Neal received one hundred twenty-six. The vote in the entire supervisor's district was as follows:

 Sledge Sledge
 A to J K to Z Darling Total
Harl O'Neal 166 173 126 465
Mrs. T.C. Simpson 124 120 233 477

PART I
The first question is, was the attempted repeal of Section 3273 Mississippi Code of 1942 Annotated (Supp. 1956) effective?
The statutes in Mississippi which provide for assistance to voters are Sections 23-5-157 and 23-7-39 Mississippi Code of 1972 Annotated (1972) and Section 3273 Mississippi Code of 1942 Annotated (Supp. 1956). Section 23-7-39 applies only when voting machines are used so the two sections which apply here are as follows:
Section 23-5-157:
Any voter who declares to the managers of the election that, by reason of blindness or other physical disability, he is unable to mark his ballot, and whose declaration is not palpably untrue, shall have the assistance of one of the managers or other person of his own selection, in the marking thereof; but such person giving such assistance shall not give information in regard to the same.
Section 3273:
A voter who declares to the managers of the election that by reason of inability to read he is unable to mark his ballot, if the same be true, shall, upon request, have the assistance of a manager in the marking thereof; and the managers shall designate one of their number for the purpose, who shall note on the back of the ballot that it was marked by his assistance; but he shall not otherwise give information in regard to the same.
The legislature, by Miss. Gen. Laws Ch. 19 (Extraordinary Session 1965), attempted to repeal Section 3273 Mississippi Code of 1942 Annotated (Supp. 1956). Section 5 of the Voting Rights Act enacted by Congress in 1965 [42 U.S.C.A. § 1973c (1965)], provides that no political subdivision subject to the Act may put into effect any voting law or election practice different from that in effect on November 1, 1964 without either: (1) submitting the proposed change to the Attorney General of the United States for his approval; or (2) instituting an action in the United States District Court for the District of Columbia for a declaratory judgment that the change sought to be put into effect does not effectively deny or abridge the right to vote on account of color. The United States Supreme Court has held the Voting Rights Act constitutional and that any change in election procedure or practice, *1001 no matter how insignificant, must be submitted for approval as required by the Act before the change becomes effective. Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).
The Attorney General of Mississippi submitted the proposed repeal of Section 3273 Mississippi Code of 1942 Annotated (Supp. 1956) to the Attorney General of the United States who disapproved the repeal of the section. The State of Mississippi has neither sought a reconsideration from the United States Attorney General nor sought a declaratory judgment from the District Court of the District of Columbia.
In two recent cases, Todd v. Smith, 331 So.2d 920 (Miss. 1976) and Jones v. Moorman, 327 So.2d 298 (Miss. 1976), we held that the attempted repeal of a statute was not effective under Section 5 of the Voting Rights Act unless approved by the Attorney General or unless a declaratory judgment was obtained as provided in the Act. We held that the attempted repeal of Section 3143 Mississippi Code of 1942 Annotated (Supp. 1956) was ineffective in view of the Voting Rights Act. Our reasons are clearly set forth in Jones, supra, and need not be repeated in this opinion.
We therefore conclude that the attempted repeal of Section 3273 Mississippi Code of 1942 Annotated (Supp. 1956) was ineffective, and the statute remains in full force and effect.

PART II
Having determined that Section 3273 is in effect, our next inquiry is, does this statute violate the Fourteenth Amendment to the United States Constitution?
Under Mississippi statutes three classes of voters are authorized to forego the secrecy of their ballot and to request assistance in casting their ballot. These are the blind, physically handicapped and illiterates. The two statutes governing assistance to voters where voting machines are not used are set forth in full in Part I of this opinion. These statutes were first enacted in 1892 and appear as Sections 3666 and 3667 of the Code of 1892. The first section governs the aid to blind or physically disable voters, the second to illiterate voters. Blind and disabled voters are permitted to have the assistance of one of the managers of the election or other person of the voter's selection, while the statute governing illiterates limits the assistance to a manager of the election and further provides that the ballot cast by an illiterate shall have marked on its back that it was marked by assistance. In all other respects the statutes are the same and both statutes require the voter requesting assistance to declare to the managers of the election the reason such voter is entitled to assistance.
When these statutes were originally enacted in 1892, we doubt that the legislature gave any consideration to whether limiting assistance to illiterate voters to a greater degree than for blind and disabled voters violated the Fourteenth Amendment to the United States Constitution. At that time the Fourteenth Amendment had not been applied to the states in as many areas as it now applies as a result of decisions by the United States Supreme Court within the last two decades.
The United States Supreme Court has held in a number of cases that states have broad powers to determine conditions under which the right of suffrage may be exercised. In Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) the Court enunciated this principle in the following language:
Indeed, `[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised.' Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072. Compare United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274. `In other words, the privilege to vote in a state is within the *1002 jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution.' Pope v. Williams, supra, 193 U.S. [621] at 632, 24 S.Ct. at [573] 575, [48 L.Ed. 817]. (380 U.S. at 91, 85 S.Ct. at 777, 778, 13 L.Ed.2d at 677, 678.)
The Court also held in Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) that every limitation or incidental burden on the exercise of voters' rights was not subject to a stringent standard of review, citing McDonald v. Bd. of Election Com. of Chicago, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). The particular inquiry is, do the statutes which distinguish between assistance available to illiterate voters and that available to blind and disabled voters violate the equal protection clause of the Fourteenth Amendment.
In Carrington, supra, the Court stated:
But the fact that a State is dealing with a distinct class and treats the members of that class equally does not end the judicial inquiry. `The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose * * *.' McLaughlin v. State of Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288. (380 U.S. at 92, 93, 85 S.Ct. at 778, 13 L.Ed.2d at 678).
However, under the "rational basis test" we see no reason for restricting assistance of illiterates to election managers and permitting blind or disabled voters to receive assistance either from a person of their own choice or from assistance from an election manager. A blind or disabled voter may also be illiterate, therefore a blind or disabled illiterate could select a person other than a manager of the election to assist in marking his ballot, whereas, a sighted illiterate voter would not have this option.
We find no case on this question except James v. Humphreys County Board of Election Commissioners, 384 F. Supp. 114 (1974). (See appendix at end of opinion.) In James the Court stated:
Without doubt, the difference in assistance allowed the several classes of voters needing assistance was a question not before the court in United States v. Mississippi, [256 F. Supp. 344] nor does it appear that plaintiffs' contentions have ever been elsewhere raised or decided in state or federal decisions interpreting the state's election laws. Also, since the 1966 decision in United States v. Mississippi, the Mississippi legislature has continued to provide no statutory regulation for assisting illiterate voters, despite a requirement for such voter assistance in the Voting Rights Act. United States v. Louisiana, 265 F. Supp. 703 (E.D.La. 1966), aff'd 386 U.S. 270, 87 S.Ct. 1023, 18 L.Ed.2d 39. It has remained, until now, an open and unsettled question whether distinctions can be validly practiced by election managers in the type of assistance provided to different classes of voters needing assistance at the polls. We are not persuaded that the Fifth Circuit's rationale in Sands v. Wainwright, 491 F.2d 417 (1973), requires the convening of a three-judge court under 28 U.S.C. § 2281 to resolve this issue. Since the repeal of § 3273, no settled statewide practice or policy in assisting illiterate voters can be said to exist, and defendants do not contend otherwise. Further, if impermissible distinctions among classes of assisted voters should be found to exist on a statewide basis, constitutional defense thereof would be frivolous in the light of Dunn [405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274] and McLaughlin, supra.

.....
Further, if such a showing were made, the distinctions which obtain could produce untoward results. The blind illiterate may receive outside assistance, but the illiterate with sight may not; and the illiterate voter, also physically disabled and presumably more helpless, can receive the outside assistance denied to the illiterate voter without physical impairment. Thus, any classification between physically disabled voters and illiterate *1003 voters, in terms of who may render assistance at the polls rests upon unclear, if not dubious reasoning.
.....
We hold that no compelling reason exists for the election officials in Humphreys County to adhere to practices which distinguish between voter assistance offered to illiterates and that allowed to the blind and disabled. Since Mississippi's election laws expressly permit optional assistance for the blind and disabled voters, the Fourteenth Amendment mandates that like optional assistance be extended to illiterate voters. (384 F. Supp. at 131, 132).
We are of the opinion that the "compelling state interest test" would not apply because, (1) the statute under consideration has for its purpose, not abridging the right to vote, but enabling illiterates to vote, and (2) racial discrimination is neither charged nor present in this case. However, under the "rational basis test" we conclude that this distinction violates the equal protection clause of the Fourteenth Amendment. We hold that illiterates are entitled to the same assistance offered blind and disabled voters for the reasons discussed in Part III of this opinion. Our next inquiry is, whether the entire statute is constitutional or does part of it survive constitutional scrutiny?
When considering whether a statute is constitutional or not, we follow the rule that part of a statute may be declared constitutional and part unconstitutional. In Wilson v. Jones County Board of Supervisors, 342 So.2d 1293 (Miss. 1977) we stated:
It is the Court's duty in passing on the constitutionality of a statute to separate the valid from the invalid part, if this can be done, and to permit the valid part to stand unless the different parts of the statute are so intimately connected with and dependent upon each other as to warrant a belief that the legislature intended them as a whole, and that if all cannot be carried into effect it would not have enacted the residue independently. Howell v. State, 300 So.2d 774, 781 (Miss. 1974); American Express Co. v. Beer, 107 Miss. 528, 536, 65 So. 575 (1914); Adams v. Standard Oil Co., 97 Miss. 879, 53 So. 692 (1910); Campbell v. Miss. Union Bank, 7 Miss. 625 (1842). (342 So.2d at 1296).
The rule as stated above is simply another way of saying where part of a statute is valid and another part invalid, the presumption arises that the legislature intended to enact the valid part if it is separate and distinct from the invalid part and is not dependent on the invalid part. We hold that the provision of the statute which requires illiterates to declare their illiteracy, in the same manner that blind and disabled voters are required to declare their disability, meets constitutional muster and serves the compelling state interest of preserving the secrecy of the ballot. Secrecy of the ballot cannot be waived except by blind, disabled or illiterate voters and then only to the extent of having assistance in marking their ballot after satisfying the managers of the election that they come within the statutory exceptions. We hold the requirement that voters declare their inability to mark their ballot to the managers of the election is mandatory for the reasons stated in Part IV of this opinion.
We therefore hold that Section 3273 is constitutional in part. We declare invalid the provision of Section 3273 limiting assistance to illiterates by managers only and requiring that their ballots have noted thereon "marked with assistance" because these provisions do not apply to blind and disabled voters under Section 23-5-157 Mississippi Code of 1972 Annotated (1972). Illiterate voters, like blind and disabled voters, as a prerequisite to obtaining assistance in marking their ballots, must declare their inability to mark their ballot to the managers. The managers are vested with the discretion of determining the truth or falsity of the reason claimed by any voter for assistance in marking his ballot, whether occasioned by blindness, physical disability or illiteracy. We are confident that managers of the elections will exercise this discretion fairly so that all who qualify for *1004 assistance in marking their ballots will receive assistance and those who do not qualify for assistance in marking their ballots will not be permitted to receive assistance. Of course, arbitrary refusal of assistance to those entitled, or arbitrarily granting assistance to persons who are not entitled thereto, is subject to judicial review, provided such action involves a sufficient number of ballots to change the result of an election or to leave the issue thereof in doubt.

PART III
Having determined that Section 3273 is constitutional in part, we must next consider whether it is superseded by the Voting Rights Act of 1965, or whether the state statute and the federal statute are in harmony and both apply to elections in Mississippi with respect to aid to illiterate voters in marking their ballots.
Three cases have been cited which speak to the question of assistance that may be given under the Voting Rights Act to illiterates participating in Mississippi elections. Hamer v. Ely, 410 F.2d 152 (5th Cir.1969); James v. Humphreys County Board of Election Commissioners, 384 F. Supp. 114 (U.S. Dist.Ct., Northern Div. Miss. 1974); United States of America v. State of Mississippi, 256 F. Supp. 344 (U.S.Dist.Ct., Southern Div. Miss. 1966).
These three cases were tried before our cases of Todd, supra, and Jones, supra, and were decided on the premise that the attempted repeal of Section 3273 was effective. It does not appear that the argument was made before any of the federal courts involved that the attempted repeal of the Mississippi statute was ineffective.
In each of the cases, the courts construed 42 U.S.C.A. § 1973l(c)(1) (1965) which is as follows:
The terms `vote' or `voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.
All three of the federal cases cited above held that the obvious intent of the Voting Rights Act was to assure, not only registration, but the full exercise of the right to vote including assistance to illiterates in marking their ballot. The federal courts, believing that Section 3273 had been repealed, leaving no provision in the Mississippi statutes for assistance to illiterates, were faced with the task of fashioning a remedy within the provisions of the Voting Rights Act to provide assistance to illiterates in marking their ballot. Indicative of this common purpose that runs throughout these three cases, the Fifth Circuit Court of Appeals stated in Hamer, supra, the following:
This requirement of voter assistance stems from the Voting Rights Act, specifically 42 U.S.C.A. § 1973l(c)(1) which defines the terms `vote' and `voting' as including `all action necessary to make a vote effective * * *.' As the three-judge court said in United States v. State of Louisiana, E.D.La. 1966, 265 F. Supp. 703, 708, aff'd 386 U.S. 270, 87 S.Ct. 1023, 18 L.Ed.2d 39:
`We cannot impute to Congress the self-defeating notion that an illiterate has the right [to] pull the lever of a voting machine, but not the right to know for whom he pulls the lever.'
In light of this requirement, it becomes
`* * * the duty and responsibility of the precinct officials at each election to provide to each illiterate voter who may request it such reasonable assistance as may be necessary to permit such voter to cast his ballot in accordance with the voter's own decision.' United States v. State of Mississippi, S.D. Mississippi 1966, 256 F. Supp. 344, 349.
The appellants' position, then, is that the use of only white poll assisters was not `reasonable assistance' in the circumstances prevailing at the Sunflower election.

*1005 The Sunflower election was governed by the Declaratory Judgment entered in the case of United States v. State of Mississippi, supra, and not by any Mississippi statute. The Mississippi statute dealing with poll assistance was repealed in 1965.

.....

The action of the Sunflower Election Commissioners, however, was in compliance with the statute as it stood before its repeal. In light of the order in United States v. State of Louisiana, supra, which was tailored to the precise terms of a repealed Louisiana voter assistance statute, the action of the Election Commissioners in the present case, tailored to the terms of a repealed Mississippi statute, would appear to be reasonable.

Voters may be motivated by reasons other than fear for not seeking voter assistance, and they have at their disposal a variety of measures to cast their votes without it. Thus, in United States v. State of Louisiana, E.D. Louisiana, 265 F. Supp. 703, 715, the court said:
There are varying degrees of illiteracy, and varying degrees of voter intelligence among functionally illiterate electors. Many illiterates are able to respond to symbols and numbers; others will memorize the positions on the ballot of those for whom they wish to vote. Still others, even if unable to do these things, are willing to take their chances rather than reveal their choices to polling officials. Nonetheless, those few voters who do not trust their own ability to cast a ballot effectively and are willing to seek assistance are, under the Voting Rights Act of 1965 as we read it, entitled to that assistance. (Emphasis supplied.)
(410 F.2d at 155-156).
As we view it, there is no conflict between the Voting Rights Act, the three federal cases cited in Part III, and Section 3273. The federal cases provided for assistance to illiterates because the courts were of the opinion that the Mississippi statute providing for assistance to illiterates had been repealed. In addition, the privilege of assistance was extended to a broader class of illiterates under the Voting Rights Act than permitted by Section 3273. The Mississippi statute (Section 3273) authorizes assistance only to voters who are unable to read, but does not include voters who may be able to read, but because of their functional illiteracy do not know how to mark a ballot for the candidates of their choice. In sum, the federal courts have construed the Voting Rights Act to authorize assistance to the latter class of illiterates. We are in accord with this construction and hold that the Voting Rights Act and Section 3273 are in harmony and exhibit a common purpose of providing assistance to illiterates in marking their ballots.

PART IV
The next question is whether assistance may be rendered to any voter who requests it, or are the statutes requiring a voter to state the reason for his disability to the manager of the election a mandatory prerequisite to receiving assistance in marking his ballot?
One of the primary purposes of laws regulating elections is to secure to a voter the right to cast his vote in secret. Secrecy of the ballot relieves the voter from every influence inimical to vote as he desires; it insures the independence of the voter as he exercises one of the most precious privileges granted under our system of government; and it is a safeguard to the purity of elections. In the case of Board v. Dill, 26 Okl. 104, 110 P. 1107 (1910) the Oklahoma Court, in a well reasoned opinion summarizing cases from other jurisdictions discussing the necessity of preserving the right to cast a secret ballot, stated:
By this it will be seen that we are again confronted with the eternal moot of whether an election statute is mandatory or directory. The perpetuity and virtue of popular government can only be secured and maintained by providing for the independence of the electors upon whose consent and will it exists. Widespread *1006 charges of improper influence, bribery, and corruption committed on the occasion of elections in many of the states of the Union, bringing in their wake defeat of the popular will and success to the corrupt schemes of designing men, brought about the election reform known as the Australian ballot system. Elections prior to it were held by an open ticket system under which secrecy was almost, if not quite, impossible, and dependent or corrupt voters were equally at the mercy and under the control of those who would use them for corrupt ends.
The Court of Appeals of New York, in the case of People ex rel. v. Board of Canvassers, etc., 129 N.Y. 395, 29 N.E. 327, 14 L.R.A. 624, says: `We know that the principal mischief which the statute was intended to suppress was the bribery of voters at elections, which had become an intolerable evil, and this was to be accomplished by so framing the law as to enable, if not compel, the voter to exercise his privilege in absolute secrecy.'
The Supreme Court of Michigan, in the case of Common Council, etc., v. Rush, 82 Mich. 532, 46 N.W. 951, 10 L.R.A. 171, says: `The secrecy of the ballot is the great safeguard to the purity of elections. The vote by ballot implies secrecy. This secrecy should not be confined to the time of depositing the ballot. It should accompany the voter through all the steps provided for the preparation of his ballot. Only in this way can he be freed from all intimidation, improper influences, reproach and animadversion. When all knowledge of how he voted is the voter's own secret unless he chooses to divulge it, he is fully protected, and a free and honest vote will very uniformly be the result.'
The Supreme Court of Appeals of Virginia, in the case of Pearson et al., v. Board of Supervisors, etc., 91 Va. 322, 21 S.E. 483, says: `The object is to relieve the voter from every influence inimical to a free and deliberate exercise of the right of suffrage, to free him from all solicitation and annoyance, and to leave him a perfectly free agent to vote as to him seems best. These provisions seem to be not only reasonable, but well adapted to secure the end in view, so far as the voter is concerned who is able to prepare his own ballot. He goes to the judges, he receives an official ballot printed by authority of the state, upon which is found every office to be filled and every candidate for that office, whose name has been filed in accordance with the requirement of the law, and he retires to a booth where he is curtained off and secluded from all the world. No eye can see him and no ear can hear him, no evil agency can approach him, and, with these environments, he prepares his ballot, folds and delivers it to the judge, who, in his presence, places it in the ballot box. * * The general scheme of the law is to secure the independence of the voter by secluding him within an isolated booth, surrounded by a neutral zone, within which none may enter save those charged with conducting the election.'
Thus it is seen that the general scheme of the system is to secure the independence of the voter by requiring him to cast his vote in secret. Secrecy is the fundamental underlying primary essential of the system and is the one element and condition which, paramount to all others, cannot be destroyed without destroying the reform intended, and re-establishing the evils it was designed to correct. Statutes which make, even incidentally, for its preservation and inviolability, are seldom directory and without exception, where the language will admit of it, are held to be mandatory. Yet, great as the demand for secrecy is, it is manifest that there is a point beyond which it may be carried, and qualified electors will be virtually disfranchised unless assisted, and the end to be attained defeated by the means provided. (Emphasis supplied). (110 P. at 1110-1111).
Our legislature has enacted various statutes for the purpose of safeguarding and insuring secrecy of the ballot. A summary of some of these statutes follows. Election officials are subject to punishment for *1007 opening and reading or consenting to any other person opening and reading any ballot given to them to be deposited in the ballot box;[1] a person may not remove any ballot from a voting place before the polls close;[2] an election official or other person, except as authorized by law, may not aid, assist or influence a voter in preparing a ballot, or attempt to do so;[3] managers and clerks of an election are required to take an oath that they will faithfully perform their duties according to law and will not attempt to guide, aid, direct or influence any voter in the exercise of his right to vote except as expressly allowed by law;[4] a voter may not occupy a voting compartment already occupied by another voter and each voter is required to fold and hand his ballot to one of the managers of the election for deposit in the ballot box without undue delay after he has voted.[5] Finally, to free a voter from coercion or intimidation in marking his ballot, to free him from divulging how he voted, and to protect his right to vote as he desires, the legislature enacted Section 23-5-159 Mississippi Code of 1972 Annotated (1972) which follows:
Any voter who shall, except as herein provided, allow his ballot to be seen by any person, or who shall make a false statement as to his inability to mark his ballot, or who shall place any mark upon his ballot by which it can afterwards be identified as the one voted by him, or any person who shall interfere or attempt to interfere with any voter when inside the compartment or inclosed place, or when marking his ballot, or who shall endeavor to induce any voter, before voting, to show how he will mark, or after voting how he has marked his ballot, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars; and the election officers shall cause any person so violating the law to be arrested and carried before the proper officer or tribunal for commitment and trial for such offense.
The overriding purpose of the above statutes is to insure that voters may not be deprived of the right to vote in secret and demonstrate the statutory safeguards provided in an attempt to guard the secrecy of the ballot. The statutes were enacted so that we might have fair and free elections which express the will of the voters. The secrecy of the ballot is a right personal to the voter and he cannot be deprived of this right. His ballot cannot be exposed except out of necessity as the result of a condition of the voter which precludes him from casting his ballot without assistance, and then only when the voter himself describes the condition and requests the assistance provided by law.
In 29 C.J.S. Elections § 208b at 571 (1956) the textwriter stated:

In order to preserve secrecy in voting, legislatures have thrown safeguards around the right to assistance which are designed to aid those voters genuinely handicapped, to protect those who are vulnerable to pressure, and to deter those persons who would exploit the electorate. Statutory provisions sometimes require an oath or declaration of the voter as to his disability or other ground for assistance as a condition precedent to the rendering of assistance. The purpose of such statutory provisions is to prevent fraud at elections. (Emphasis supplied).
In Brooks v. Crum, 216 S.E.2d 220 (W. Va. 1975) the West Virginia Court had under consideration statutes of that state regulating assistance to illiterates and physically disabled voters. The West Virginia statute requires that active assistance to voters by election officials may be given only when the statutory prerequisites have been met. *1008 The court held that where mandatory preconditions prescribed by statute are not satisfied before assistance is extended to voters by election officials, it is active assistance per se, rather than the actual effect upon voters free choice which is unlawful.
In Crum the West Virginia court stated:
The second and third issues, concerning what voters are entitled to assistance by election officials while casting their ballots, and whether otherwise legal votes are voided by assistance from officials to voters unqualified to receive assistance, raise matters not previously decided by this Court.
.....
A reading of these two provisions clearly indicates that active assistance to voters by election officials may be permitted only when the statutory prerequisites have been met. The only significant distinction between W. Va. Code 1931, 3-1-34, as amended, and W. Va. Code 1931, 3-4-21, as amended, is that the former deals with votes cast upon written ballots, while the latter deals with votes cast upon voting machines.
In both sections, a necessary precondition to rendering assistance to voters is that their illiteracy must be shown unequivocally on the face of the voters' registration. Where no recordation of illiteracy is found thereon, and where an obvious physical disability which would prevent the voter from operating the machine is not present, no discretion is given election officials. They are without legitimate authority, whether requested by the voter or not, to enter the voting machine with him or to assist him in casting his vote. If further demonstration of the legislative intent is necessary, one need only examine W. Va. Code 1931, 3-4-14, as amended, which provides the procedure for assisting and instructing voters unfamiliar with electronic voting equipment, and W. Va. Code 1931, 3-4-22, as amended, which mandates: `[N]o person other than the voter alone may be in, about or within five feet of the voting machine during the time such voter is in the process of voting at any election, and, during such time, no person may communicate in any manner with the voter ...', except as specifically provided by statute.
.....
Clearly the legislative objective manifested by enactment of both statutes was to insure each voter a free and deliberate exercise of his right to suffrage, preventing possible solicitation or interference in the exercise, and leaving him free to vote as he deems best. Quoting from Cooley's Cons.Lim. 757, this Court in Daniel v. Simms, 49 W. Va. 554, 39 S.E. 690 (1901), stated:
`All such reasonable regulations of the constitutional right [to vote] which seem to the legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression and to preserve the purity of the ballot box, are not only within the constitutional power of the legislature, but are commendable and at least some of them absolutely essential.' Id at 574, 39 S.E. at 698.
While we recognize the general rule that presumptions favor generally the correctness of action on the part of election authorities and specifically the regularity of votes cast and counted, we are equally cognizant of the legislative demand that certain protections are necessary for the preservation of the integrity and sanctity of the elective process . .
If appellants have offered sufficient proof of their charges that assistance was given by election officials to voters who were not qualified to receive assistance, then their votes must be voided. (216 S.E.2d at 224, 225).
Without dispute, the evidence supports the conclusion that the activities of the poll watchers in rendering assistance to voters violated the provisions of Section 3273. Of the one hundred or so voters, only a few declared their inability to read, their physical disability or their blindness to the election managers themselves. One or two blind or disabled voters were assisted so the *1009 only justification for rendering assistance to the remaining ninety-eight voters would be that they were illiterate. There were only twenty-one voters who could not write their own names and no effort was made to ascertain the reason for assistance being rendered to more than seventy other voters. The purpose for requiring a declaration by a voter to the election officials of his inability to read, his blindness or his physical disability, rendering him unable to mark his ballot is to protect the voter himself and to preserve the secrecy of his ballot.
If election officials permitted all voters to have assistance in marking their ballots, without regard to whether the voter is entitled to assistance, secrecy of the ballot would be destroyed, voters would be subject to coercion and undue influence, utter confusion would exist at the polling places and the opportunity for fraud would be unlimited. If a candidate wanted to buy a vote he could insure that the vote was cast in his favor by the simple expedient of having a partisan poll watcher or other person mark the ballot of the voter. In this case the wrong was compounded by the fact that partisan poll watchers appointed by Mrs. Simpson were permitted to assist voters without regard to whether the voters were entitled to assistance. This situation cannot be tolerated and should be stopped before the opportunity for widespread corruption infects our elections.
We hold that before any voter may receive assistance in marking his ballot, he must first request assistance from the managers of the election who must be satisfied that the voter is either blind, physically disabled or illiterate and needs assistance in marking his ballot. We are of the opinion that the legislative protections insuring the secrecy of the ballot are mandatory and are necessary for the preservation of the integrity of the election process; therefore, all voters are not entitled to assistance in marking their ballots, but only the blind, physically disabled or illiterate may receive assistance in marking their ballots.

PART V
The last issue involves the scope of judicial review of a contested general election. Pradat v. Ramsey, 47 Miss. 24 (1872) involved a contested general election in Harrison County and is the first case which discussed the scope of judicial review in general election cases. The Court stated:
The fundamental principle to which the judiciary look, is whether the election has had a termination, according to the will of a plurality, or majority of those qualified to vote.
Irregularities of the officers of election, such as not being properly sworn, not being de jure appointed, or qualified, having no other right than being de facto incumbents, a failure to appoint subordinate assistants, such as a clerk, securing votes, after the outer door of the room had been closed, and from those who remained within, (voters not being thereby deprived of their rights,) or other failure to follow the law, will not vitiate the election. The people who are electors, should not be deprived of the benefit of their votes, because those whose duty it was to hold the election, were ignorant, incompetent, or wilfully failed in some particulars to do their duty. Nor should the successful candidate lose his office, because of the misconduct of these officials, if he is free from complicity with them, and has not gained the office by reason of such misbehavior.
If the election was held at the proper time and place, and under the supervision of competent persons, irregularities which concern merely the form of conducting it will not avail; it must be shown that legal votes have been rejected, or illegal votes have been received, and that because of the one or the other, or both, the result does not conform to the will of the voters, or uncertainty has been case upon the result ...
.....
But if the matter offered went merely to prove an irregularity in the registrars, inspectors, or canvassers, some omission to follow the letter of the law, in a matter directory merely, its admission would *1010 in no wise help the contestant. It was incumbent on him, in order to overcome the prima facie case, which the certificate of the canvassers of the ballots created, to show that illegal votes were given to Ramsey, or legal votes excluded from himself, or some other reason, which would establish that he was entitled to the office ...
The statute seems to confine the inquiry to the question of who received a majority of legal votes .. .
.....
The theory of the plaintiff was, that omissions and irregularities, and errors of judgment by those charged with registration, holding the election, and canvassing the ballots, would make the election illegal, and demonstrate that Ramsey had no title to the office. Hence his several offers to make proof on these points, the circuit court disagreed with him, and ruled that the test of his right under the issue was, whether a majority of legal votes preferred him for the office, and therefore he must prove that qualified voters were rejected, and illegal ballots received, which would change the result. (47 Miss. at 34, 35, 37, 38, 39).
The case first holds that a contestant must show that legal votes have been rejected or illegal votes received and that because of one or the other, or both, the result of the election does not conform to the will of the voters, or uncertainty has been cast upon the results. It is then noted the statute seems to confine the inquiry to the question of who received a majority of the legal votes and that a contestant must overcome the prima facie case granted by the certificate of canvassers of the ballots. Pradat v. Ramsey has been followed in a number of cases[6] holding that the inquiry in a general election contest is confined to the question of who received a majority of the legal votes. We find no further mention of the first proposition pertaining to uncertainty being cast upon the results of the election because illegal votes were received and counted except in Trahan v. Simmons, 191 Miss. 353, 2 So.2d 575 (1941). Four votes separated the two candidates in Trahan and it was stipulated that twenty-two illegal votes were cast and counted which were included in the total certified by the election commissioners. The Court stated:
It was distinctly announced by this Court in Hayes v. Abney, 186 Miss. 208, 188 So. 533, 535, that `where enough illegal votes were cast to change the result or leave it in doubt, the election is void.' The rule as stated, whatever may be its ultimate effect, is applicable, however, only when the attorney general or district attorney has, in such a case, instituted an action in quo warranto, solely in the name of the State, to oust a person who has intruded himself into office under an election void for the stated reason. It can have no application in an election contest between the candidates wherein the candidate certified as having lost seeks, not to avoid the election, but to avail of it and to show by his contest that in fact he was elected by the majority of the qualified voters who voted. In such a contest he has the burden of the proof; and manifestly this is not met simply by showing that enough illegal votes were cast to change the result or leave it in doubt.
And the contestant in making his proof cannot be allowed to place on the witness stand the qualified voters and show by them for whom they voted. Under our secret ballot system a qualified voter cannot be thus interrogated. But this exemption does not belong to an illegal voter. Such a person is not a voter, and his wrongful assertion and exercise of the privileges of a voter do not make him such. An extended examination of the authorities, many of which are noted in 20 C.J., pp. 246, 247, when read in the light of the implications in Kelly v. State, *1011 79 Miss. 168, 30 So. 49, has convinced us that an illegal voter may be summoned as a witness and be put on the stand and compelled to disclose for whom he cast his illegal ballot. (191 Miss. at 355, 356; 2 So.2d at 575).
In Trahan the Court cited Hayes v. Abney, supra, as authority for the proposition that where enough illegal votes were cast to change the result, or leave it in doubt, the election is void. The Court then held that the rule applied only in quo warranto proceedings but cited no authority for this conclusion. Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940) followed Hayes, supra, and held that if sufficient illegal votes were cast to change the result it was proper to order another primary election.
We discern no valid reason for ordering a new election in a primary election contest where a sufficient number of illegal votes are counted which would change the result, or leave it in doubt, and refusing to apply the same rule in a general election contest. We, therefore, overrule Trahan, supra, to the extent that it conflicts with this holding and modify the cases listed in footnote six to conform to our holding here. This gives effect to the language in Pradat v. Ramsey, supra, where it was stated:
[I]t must be shown that legal votes have been rejected or illegal votes have been received, and because of the one or the other, or both, the result does not conform to the will of the voters, or uncertainty has been cast upon the result. (47 Miss. at 34, 35). (Emphasis supplied).
As previously discussed, permitting voters to receive assistance in marking their ballot is contra to our statutes enacted for the purpose of preserving a secret ballot. See statutes listed in footnotes 1-5, Sections 23-5-157 and 159 Mississippi Code of 1972 Annotated and Section 3273 Mississippi Code of 1942 Annotated. The case of Oglesby v. Sigman, 58 Miss. 502 (1880), involved a general election, and condemned the practice of placing a mark on a ballot by which it might be identified in violation of a statute prohibiting the practice, holding that the statute had for its purpose securing secrecy of the ballot.
Recently we held in Clark v. Rankin County Democratic Executive Committee, 322 So.2d 753 (Miss. 1975) that a new election should be ordered where ballot boxes were opened and ballots counted before the polls closed because the practice could lead to destroying the secrecy of the ballot and present the opportunity for fraud in counting the ballots. Clark dealt with Section 23-3-13 Mississippi Code of 1972 Annotated which is a part of the Corrupt Practices Act governing the conduct of primary elections, but the principle applies to our general election laws as well. Section 23-5-147 Mississippi Code of 1972 Annotated applies to general elections and has the same provision as section 23-3-13 pertaining to opening ballot boxes and counting ballots. In Clark we stated:
The above statute was violated in the following particulars: (1) The ballot box was not only opened prior to the time prescribed for closing of the polls but was opened while the election was still in progress. Section 23-3-13 provides `... when the polls shall be closed, the managers shall then publicly open the box and immediately proceed to count the ballots, at the same time reading aloud the names of the persons voted for, which shall be taken down and called by the clerks in the presence of the managers.' There is no provision in the law which permits a ballot box to be opened and for counting to begin while the election is still in progress. To do so is a total departure from a mandatory feature of the Corrupt Practices Law specifically designed to insure the secrecy of a voter's ballot and to guard against the opportunity for fraud in the counting of the ballots. If such procedure were permitted, there would be nothing to prevent opening the box immediately after the balloting begins and counting each ballot as it is cast. This would violate the fundamental principle of the right to cast a secret ballot ...
.....

*1012 When, as in this case, there has been a total departure from the mandatory provisions of the Corrupt Practices Law with respect to the time, manner and conditions under which the ballots were counted, the contestee cannot successfully claim that the contestant has failed to show the will of the electors could not be ascertained or has not shown the existence of fraud in connection with such counting. The departure complained of deprives him of the very means by which the fraud could be detected if any exists. Briggs v. Gautier, [195 Miss. 472, 15 So.2d 209] supra.

We have held in a number of cases that where there has been a radical departure from the mandatory provisions of the Corrupt Practices Law the result of the particular precinct or precincts in question is void. Wallace v. Leggett, 248 Miss. 121, 158 So.2d 746 (1963); Ulmer v. Currie, 245 Miss. 285, 147 So.2d 286 (1962); May v. Layton, 213 Miss. 129, 56 So.2d 89 (1962); Briggs v. Gautier, supra; Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940); Hayes v. Abney, 186 Miss. 208, 188 So. 533 (1939). (322 So.2d at 756, 757).
Clark is another example of judicial sanction of statutes protecting the secrecy of the ballot and prohibiting departure from mandatory statutes regulating elections which could deprive a candidate of the very means of detecting fraud, if any exists. Although the statute violated in Clark involved a primary election contest, in view of the fact that we have a similar statute (section 23-5-147) regulating opening ballot boxes and counting ballots in general elections, the same rule should be applied in a general election contest under the facts that existed in Clark.
In this case more than seventy votes at the Darling precinct must be voided for the reasons heretofore stated in this opinion. Only twelve votes separated the two candidates in this election so there were sufficient illegal votes to change the result, or to cast uncertainty upon the result, so that the will of the voters cannot be ascertained.
Two courses of procedure are available in this case. First, we could disregard the vote at the Darling precinct because of the violations heretofore shown and declare O'Neal the winner, or, second, we could order a new election. If we followed the first alternative the effect would be to disfranchise a large number of legal voters at the Darling precinct. This we do not choose to do. Because enough illegal votes were cast to change the result of the election, we declare the office of Supervisor, District No. 1, Quitman County, vacant and the Board of Supervisors is directed to fill the vacancy and order an election under the provisions of Section 23-5-195 Mississippi Code of 1972 Annotated.
By way of summary, we hold:
1. That statutes that have as their purpose preservation of secret ballots are mandatory.
2. That all voters are not entitled to have another person accompany them into a voting booth to assist them in marking their ballots.
3. That only blind, physically disabled or illiterate voters may have a person accompany them into a voting booth for the purpose of assisting a voter mark his ballot, and this only after the voter himself has declared his disability and requested assistance, and the managers of the election are satisfied that the claimed disability exists.
REVERSED AND RENDERED.
PATTERSON, C.J., and ROBERTSON, WALKER, BROOM and LEE, JJ., concur.
INZER and SMITH, P. JJ., dissent.
BOWLING, J., took no part.

APPENDIX
In James v. Humphreys County Board of Election Commissioners, the federal district court stated that Section 3273 Mississippi Code of 1942 Annotated had been repealed and further held that constitutional differences of a similar statute would be frivolous. The Court was without authority to *1013 prospectively declare a statute unconstitutional under the authority of United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) in which the Court stated:
This Court, as is the case with all federal courts, `has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899, 901. (Emphasis supplied). 362 U.S. at 21, 80 S.Ct. at 522, 4 L.Ed.2d at 529).
The district court should not have anticipated a question of constitutional law in advance of the necessity of deciding it.
INZER, Presiding Justice, dissenting.
I dissent to the holding of the Court as reflected by Part V of the majority opinion. This Court has no right or power to nullify, amend, or repeal a valid statute or to enact a new one. Neither should it disregard the former decisions of this Court in deciding this case.
In order that this case may be properly understood, it is necessary that the testimony be detailed. Appellant Harl O'Neal and appellee Mrs. T.C. Simpson were candidates for the office of supervisor for District One, Quitman County. O'Neal was the democratic nominee and Mrs. Simpson qualified as an independent. Mrs. Simpson was declared the winner by twelve votes. O'Neal asked for a recount, the votes were recounted, and the result remained the same.
Thereafter appellant filed his petition under the provisions of Section 23-5-187, Mississippi Code 1972 Annotated. This petition first alleged that Mrs. Simpson was illegally placed on the ballot as a candidate because she had participated in the democratic primary. This contention was without merit and has now been abandoned. O'Neal then alleged that he received the greatest number of legal votes cast in the general election. It was charged that unfair, improper, and illegal procedures were followed at the Darling voting precinct, and, because of such irregularities a large number of votes cast for Mrs. Simpson should not be counted. One of the irregularities charged was that Mrs. Simpson ostensibly employed Elizabeth Daniels and Fannie Smith as poll watchers, but they actually were sent to the polls to solicit votes for Mrs. Simpson. It was charged that these two persons approached voters and offered to help them cast their ballots when such voters were neither blind, illiterate, or otherwise incapacitated and in no way had asked for help in casting their ballots; and, that the number of such voters approached and who were assisted in marking their ballots were approximately 100 in number.
It was then charged that a number of ballots in excess of twelve voting for Mrs. Simpson at the Darling box were marked in pencil contrary to the law of the State of Mississippi and a number of ballots for Mrs. Simpson in the Darling box in the excess of twelve were marked with symbols not authorized by law. No proof was offered to support either of these contentions.
It was then charged it was contrary to law to permit anyone to be given assistance at the Darling precinct who did not declare his inability to read, but that a large number who received assistance could read and did not declare to the election managers their inability to read or inability to mark their own ballots.
It is charged that it was contrary to law for any person other than the manager of the election to mark the ballots, and the manager did not mark the ballots showing that the voters received assistance as required by law.
*1014 The petition also charged that Mrs. Simpson illegally solicited votes at the Darling precinct. No proof was offered to substantiate this claim. The petition prayed that the cause be heard by a jury as provided by Section 23-5-187 to determine the legality of the election and to determine the name of the person having received the greatest number of legal votes cast.
Mrs. Simpson answered and admitted that Elizabeth Daniels and Fannie Smith were poll watchers at the precinct but denied the other allegations as to their actions. She denied that any of the ballots in the general election were marked with pencil or marked with symbols. She also denied that she illegally solicited voters in the Darling precinct or that ballots were improperly marked at such polling places by the election officials. Certain affirmative defenses were also alleged, but these are not involved on appeal.
It should be noted that the petition does not charge that the election officials were guilty of any fraud. It is only charged that they failed to enforce the laws relative to voters being given assistance. Neither is it charged that Mrs. Simpson is guilty of fraud, but it is charged that her workers illegally assisted voters in casting their ballots.
Mrs. Simpson was called as an adverse witness. She admitted on the day before the election she solicited Mrs. Daniels and Mrs. Smith to be poll watchers for her at the Darling precinct. She gave each of them a slip showing that they were authorized to be poll watchers for her. She said she offered to pay them for their services, but they did not want to accept payment so she left $80 on the table. She denied that she requested them to assist voters or that she illegally solicited anyone to vote for her. She said she gave them a list of the voters at the Darling precinct and asked them to keep up with who voted and to watch what occurred at the polls. She did not know what occurred inside the polling place, as she was outside.
Mr. O'Neal testified that he did not go to the Darling precinct on election day, but stayed at the Sledge precinct. He said all that he knew about what occurred there on election day was what the election officials told him and what he found out from people who voted at the precinct. He said that this information was the basis upon which he filed his petition. He said he did ask for a recount of the votes and that after a recount it did not change the result of the election.
Reverend James Arliss Bryant, who was pastor of the Darling Baptist Church, served as one of the managers of the election. He said after the voting started he noticed Mrs. Smith in the booth helping someone vote. Mr. Wofford, another manager, asked her to hold up and she did so while Mr. Wofford went out and had a conference with someone. He came back and said that anyone who wanted assistance could get it. He said that is the way it went all day. He estimated that approximately 100 persons received assistance. On cross examination he said he did not know, of course, for whom the people receiving assistance voted. He said anyone asking the clerk of the election for assistance was allowed to choose anyone they desired to help them. He said he did not think there was anything wrong with them getting help.
Mr. W.E. Wofford, the other manager at the Darling precinct, testified that he observed Mrs. Smith in the booth with one of the voters and told her that she was not supposed to be in the booth with someone else. He said Mrs. Smith stopped, came out, and said, "well, I've been doing this in other elections before." He then asked her to come outside until he could clarify the matter. Mr. Wofford talked with Brother Bryant and then with other officials that he could find, and the way the rules were interpreted by these people was that anyone who wanted help could ask someone to go into the booth and help them vote. He estimated that Mrs. Daniels and Mrs. Smith assisted approximately 100 voters. He said one or two blind persons voted. He estimated that ten or fifteen voters announced to him personally that they could not read *1015 or write, and he helped three or four of them vote, but most of them asked Mrs. Daniels or Mrs. Smith to assist them. He said he did not know of any incidence where Mrs. Daniels or Mrs. Smith were asked to assist a voter that they did not mark the ballot exactly as the voter requested. He said he did not remember Mrs. Smith or Mrs. Daniels asking any voter if they wanted assistance.
The petitioner then called six persons who voted at the precinct and their testimony, in essence, is as follows:
Mrs. Mamie Ruth Bennett testified that she voted at the Darling precinct and, after she received her ballot, a lady asked her if she needed assistance and she told her the only assistance she needed was someone to show her how to fold the ballot after she voted. She said no one helped her vote, and she marked her own ballot, but the lady showed her how to fold the ballot.
Mrs. Izonia Thomas said she voted at the Darling precinct and that she asked Elizabeth Daniels to help her vote. She said Mrs. Daniels marked the ballot as she told her to do. She had finished the fourth grade and said she could read better than she could write.
Mrs. Minnie Smith also voted at the Darling precinct. She said she could read and write, but when she went in a white man told her if she needed or wanted any help there were some helpers there who would assist her. Mrs. Smith said she was a diabetic and was feeling weak and badly, and she asked Mrs. Daniels if she would help her. Mrs. Daniels said she would. Mrs. Smith got her ballot and Mrs. Daniels marked it just as she told her to do. Mrs. Smith said she folded it and put in the box.
Leon Bennett testified that when he went to vote at the Darling precinct he heard Elizabeth Daniels say to another woman, "don't bother him, he ain't going to let nobody help him."
George Clark said he could read and write a little bit. He signed to get his own ballot, and no one helped him vote. He said he asked Mrs. Daniels to assist him in pronouncing a name he could not pronounce after spelling.
Mrs. Rosa Lee Redditt also said she could read and write, but the clerk signed her name for her to get the ballot. She said she had left her glasses, and she asked a lady whom she did not know to help her vote because it was dark in the booth and she could not see without her glasses.
By agreement, the ballot boxes of the Darling and Sledge precincts were introduced in evidence.
This was all the material testimony offered by O'Neal in support of the allegations of his petition. It is apparent that there was no proof to support the allegations that the two ladies who rendered assistance to the voters made any attempt to influence a voter to vote for Mrs. Simpson or did not mark the ballot of the voter as directed. In fact, the testimony offered established that the voters either voted the ballot themselves or testified that the ballot was marked exactly as requested. The most that this evidence establishes is that there is a probability that they did do something wrong. Furthermore, O'Neal was aware of who voted at the Darling precinct at the election. He was also aware that a large number of voters received assistance. Yet, he only produced six witnesses who voted at the Darling precinct although admittedly almost a year had elapsed from the time of the election until the day of this trial. He wholly failed to show that any person who voted at the Darling precinct was an illegal voter. He failed to show that Mrs. Simpson was guilty of any illegal activity at the polls. It is not contended that the election holders were guilty of any fraud or attempted to influence the voters to vote for either candidate. In fact, the only thing shown by the testimony is that the managers were uncertain about the law pertaining to voters obtaining assistance. Apparently, they attempted to find out what the law was, and the information they received was that a voter who wanted help could request help from anyone of his choice. It is also apparent from what is written in the majority opinion there was *1016 uncertainty as to whether there was any statute in effect governing the assistance for illiterate voters. The federal court thought it had been repealed and had laid down the rule that an illiterate was entitled to assistance from anyone of his choice. Furthermore, although the statute had not been repealed, it was constitutionally defective and could not be enforced as written. Under these circumstances the jury was justified in finding that the way the election was conducted did not affect its outcome.
There is no doubt that every vote cast at this precinct was a legal vote by a qualified elector. There is no doubt that Mrs. Simpson received a majority of the votes cast at the election. The jury had before it the ballots cast at both precincts and was in a position to examine the ballots or recount them, if they so desired. Since the jury found for Mrs. Simpson the evidence must be considered by this Court in the light most favorable to her.
Insofar as the scope of review in this case is concerned, it is governed by statute and the former decisions of this Court. The controlling statute is Section 23-5-187, Mississippi Code 1972 Annotated, and the pertinent part reads as follows:
A person desiring to contest the election of another person returned as elected to any office within any county, may, within twenty days after the election, file a petition in the office of the clerk of the circuit court of the county, setting forth the grounds upon which the election is contested; and the clerk shall thereupon issue a summons to the party whose election is contested, returnable to the next term of the court, which summons shall be served as in other cases; and the court shall, at the first term, cause an issue to be made up and tried by a jury, and the verdict of the jury shall find the person having the greatest number of legal votes at the election. If the jury shall find against the person returned elected, the clerk shall issue a certificate thereof; and the person in whose favor the jury shall find shall be commissioned by the governor, and shall qualify and enter upon the duties of his office. Each party shall be allowed ten peremptory challenges, and new trials shall be granted and costs awarded as in other cases. (Emphasis added).
A statute of similar import has been in effect in this state since at least 1848. In the early case Pradat v. Ramsey, 47 Miss. 24 (1872), quoted from in the majority opinion, it is stated that the statute [the forerunner of our present statute] seemed to confine inquiry to the question of who received the majority of the legal votes. The Court, after setting out the contention of the appellant, said:
The theory of the plaintiff was, that omissions and irregularities, and errors of judgment by those charged with registration, holding the election, and canvassing the ballots would make the election illegal, and demonstrate that Ramsey had no title to the office. Hence his several offers to make proof of these points, the circuit court disagreed with him, and ruled that the test of the right under the issue was, whether a majority of legal votes preferred him for the office, and therefore he must prove that qualified voters were rejected, and illegal ballots received, which would change the result. Also, that such disorder and tumult prevailed as interfered with the voting, and prevented balloting to that degree as to vitiate the election. That the errors, irregularities, etc., on part of the officers, did not make the election void, and could not have the effect of vitiating the choice made by the electors. We think the views of the circuit judge were substantially correct, and affirm the judgment. (Emphasis added). (47 Miss. at 38, 39).
In Weisinger v. McGehee, 160 Miss. 424, 134 So. 148 (1931), it is stated:
The sole issue which the court that tried the contested election case was authorized to submit to the jury is that prescribed by section 6258, Code of 1930, which is that it "shall find the person having the greatest number of legal votes at the election." This seems to have been *1017 the only issue there considered by the jury for the verdict returned by it was: "We the jury find for the contestant, Mrs. Ada Guice, and that she received the greatest number of legal votes in said election." (160 Miss. at 430, 134 So. at 149).
In May v. Young, 164 Miss. 35, 143 So. 703 (1932), we said:
The only question which the court below was authorized to investigate and determine was which of the parties hereto received "the greatest number of legal votes at the election." Section 6258, Code of 1930. Pradat v. Ramsey, 47 Miss. 24; Weisinger v. McGehee, 160 Miss. 424, 134 So. 148. (164 Miss. at 40, 143 So. at 703).
The case of Word v. Sykes, 61 Miss 649 (1884), involved a charge of fraud. This Court in reversing the case laid down the following rules:
The cardinal rules controlling such cases are these: Where the charge is fraud, the burden is always upon the contestant to show both fraud and injury to himself in the conduct and count of the canvass, and that, in truth and in fact, he received the greatest number of legal votes. Until he has proved both of these ordinarily he can never recover. Unless he received a majority of the legal votes he has no right to bring his suit, and he can complain of no sort of irregularity or fraud save when he affirmatively shows that he was thereby damaged; the fact that he may have been so is not enough, though he may show such possibility as tending to prove that in fact he was injured, and he may show this by any proof admissible in any other inquiry as to fraud. But always his obligation is to prove that he was really elected by a plurality or majority of legal votes. Unless by the whole proof he has done so, his case must be dismissed or decided against him. (Emphasis added). (61 Miss. at 662).
In the case before us, the most that O'Neal was able to show was a possibility that he was damaged by the way the election was conducted. The jury resolved this issue against him.
The foregoing rules were followed in Lopez v. Holleman, 219 Miss. 822, 69 So.2d 903 (1954), a case involved fraud and where the jury, by its verdict, found fraud on the part of the election holders at two precincts.
In spite of the fact that this Court has followed the plain terms of the statute for these many years, the majority now says that the statute is wrong and in effect says it should be amended by adding to the words, "and the court shall, at the first term, cause an issue to be made up and tried by a jury, and the verdict of the jury shall find the person having the greatest number of legal votes at the election," the words "but if the evidence shall establish the election holders departed in any material manner from the statutory requirements of the law relative to holding elections, then the court, not the jury, shall declare the election void and order a new election." Although it may be desirable that the statute be amended, this Court has no right to do so.
Furthermore to accomplish this purpose the majority, without saying the case was wrongfully decided, proceeds to overrule in part Trahan v. Simmons, 191 Miss. 353, 2 So.2d 575 (1941). This case involved a special election held in the Fifth District of Pike County for the election of a justice of the peace. The return certified that Simmons received 170 votes and Trahan received 166. Trahan contested the election and at the trial it was stipulated that there were 22 illegal votes cast and counted at the election. Trahan offered to put the illegal voters on the stand and prove how they voted. The court sustained objections to this testimony and did not allow Trahan to put these witnesses on the stand and to show how they voted. On appeal, it was contended, among other things, that the court should have followed the rule announced in Hayes v. Abney, 186 Miss. 208, 188 So. 533 (1939), a primary election case. What this Court said was that the rule announced in that case to the effect "where enough illegal votes were cast to change the *1018 result or leave it in doubt, the election is void," was inapplicable in a general election. In so holding the Court stated:
The rule as stated, whatever may be its ultimate effect, is applicable, however, only when the attorney general or district attorney has, in such a case, instituted an action in quo warranto, solely in the name of the state, to oust a person who has intruded himself into office under an election void for the stated reason. It can have no application in an election contest between the candidates wherein the candidate certified as having lost seeks, not to avoid the election, but to avail of it and to show by his contest that in fact he was elected by the majority of the qualified voters who voted. In such a contest he has the burden of the proof; and manifestly this is not met simply by showing that enough illegal votes were cast to change the result or leave it in doubt. (Emphasis added). (191 Miss. at 355, 356, 2 So.2d at 575).
This holding merely followed the rule laid down in the cases heretofore cited and correctly stated the law. The Court then held that the persons who cast the illegal votes could be required to testify how they voted and reversed the case. See also Walker v. Smith, 213 Miss. 255, 57 So.2d 166 (1952), where this Court quoted with approval the foregoing statement.
The majority then cites and quotes the rule announced in the recent case of Clark v. Rankin County Democratic Executive Committee, 322 So.2d 753 (Miss. 1975). This case was a primary election case wherein we held that where there had been a radical departure from the mandatory provisions of the Corrupt Practices Act the result of the particular precinct or precincts in question is void. The Court there applied the primary election law. The majority now says that this rule should be applied to a general election case. This is contrary to statute and contrary to our case law.
In Lopez v. Holleman, supra, in upholding a jury verdict that excluded the entire return of two precincts, we pointed out the distinction between the primary law and the general election law, saying:
Under the primary statutes, Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940), involved a charge of fraud by the election officers in a petition contesting a primary election, and this Court affirmed the overruling of a demurrer to that petition, where it was averred that the managers at the two boxes in question knowingly permitted the illegal votes and actually encouraged them. Moreover, the primary election statute, Sec. 3167, on an issue analogous to the present one, gives the county executive committee the power to throw out an entire box where it is impossible to arrive at the will of the voters at that precinct and the managers at that box deliberately permitted or engaged in material irregularities and fraud by manipulating the election and the returns.
(219 Miss. at 846, 69 So.2d at 912).
Section 3167 referred to in Lopez is now Section 23-3-19, Mississippi Code 1972 Annotated, which is a part of the Corrupt Practices Act controlling primary elections. It authorizes the executive committee or the special tribunal on review in a proper case to throw out an entire box and order another primary election to be held. There is no such authority granted under the general election laws. There can be no doubt that the legislature has the constitutional authority to pass one set of laws to govern primary elections and another set of laws to control general elections.
The attempt to apply the primary election statute to a general election is contrary to our holding in Hubbard v. McKey, 193 So.2d 129 (Miss. 1966). This case involved a special election governed by the general election laws for the office of Supervisor for the Third District of Hinds County. McKey was certified the winner and Hubbard contested the election. After trial the issue was submitted to the jury and the jury found that McKey had received the greatest number of legal votes. We stated, among other things:
Contest of such an election is covered by Mississippi Code Annotated section 3287 *1019 (1956). It is required that at the first term after the filing of a petition to contest the election the court shall cause an issue to be made up and tried by a jury and the verdict of the jury "shall find the person having the greatest number of legal votes at the election." That is the issue that is tried by the jury, and that is the issue that was submitted to them here.
On his appeal, appellant assigns and argues that the lower court erred in striking from his petition an averment that certain ballots were illegal and void because they had not been initialed by the initialing manager of the particular voting precinct.
Mississippi Code Annotated section 3164 (Supp. 1964), is the section which provides for the initialing of ballots.
This section is in the chapter on primary elections and is a part of what is known as the "Corrupt Practices Act." The said section begins by saying "At all primary elections * * *" the ballots shall be initialed. It also provides the manner of voting in primary elections.
Mississippi Code Annotated section 3267 (Supp. 1964), in the chapter on "Registration and Elections", states how general elections shall be held. No mention is there made of initialing the ballots.

Each of these sections is complete on its face, and there is no ambiguity in either as to initialing ballots. However, appellant argues that the statutes should be considered as being pari materia. This doctrine is one which is invoked when a statute is ambiguous or doubtful, and is not to be invoked where the language of a statute is clear. 50 Am.Jur., Statutes § 348 at 345 (1944); 82 C.J.S. Statutes § 366, at 801 (1953). We hold that the court was correct in striking such allegation.
(193 So.2d at 130, 131).
The general election law is clear and specific relative to a contest of a general election. The legislature in setting up this procedure no doubt had in mind an early end to a contest of a general election. Although it may seem desirable to this Court that the laws governing primary and general elections be the same insofar as election contests cases are concerned, the legislature has not seen fit to so provide and the legislature alone and not this Court has the constitutional right to legislate in this field. The separation of powers mandates restraint.
Certainly this Court does not and should not condone what happened in this case, but the jury had the facts before it and was told by their instructions what the law was relative to the assistance of illiterates. The jury considered the evidence and evidently determined, as it had a right to do, that there had been no intentional wrongdoing on the part of the election holders and that the assistance rendered at the polls by the paid poll watchers or workers was not cause to discard the votes cast at the Darling precinct and declare O'Neal the winner. Furthermore, the trial judge saw and heard the witnesses testify and he did not think the verdict of the jury was against the overwhelming weight of the evidence or contrary to law. If we follow the terms of the statute, and the decisions of this Court, this case would of necessity have to be affirmed. Especially is this true since the trial court granted appellant what he requested by his petition. That is, for a trial by a jury to determine the legality of the election and to determine the person having received the greatest number of legal votes cast. This issue was submitted to the jury and it found against him. Now he wants this Court to declare the election void, throw out the election, and grant him a new election. This request certainly should not be granted. In the first place he did not request the trial court to do so, and in the second place there is no authority under the general election laws for this Court to declare an election void and order a new election. Furthermore, it is not every departure from the requirements of the Corrupt Practices Act that requires a new election. In Walker v. Smith, supra, a primary election case, in the suggestion of error this Court, in discussing this question, stated:

*1020 What constitutes such a substantial failure to comply in material particulars with the requirements of the statutes in a primary election, which would fall within the foregoing classification so as to require the throwing out of a box or calling a new election, depends upon the facts and circumstances in each particular case, including the nature of the procedural requirements violated, the scope of the violations, and the ratio of illegal votes to the total votes cast. For example, in May v. Layton [56 So.2d 89], supra, 836 votes out of a total vote of 2213 were held to be illegal, and it was said that this result, by holding void more than one-third of the total votes cast, made it impossible to determine the will of the voters and constituted such a substantial failure to comply with the statutes as to require a new election.
(213 Miss. at 264, 57 So.2d at 167).
I know that it is the earnest desire of every member of this Court to be sure that the right decision is reached in each case. While the result reached by the majority may be desirable, it is my sincere belief that it is contrary to the settled law of this state relative to the contest of a general election. We should not make uncertain that which has been certain for these many years.
For the reasons stated, I am of the opinion that this case should be affirmed and I would affirm.
SMITH, P.J., joins in this dissent.
NOTES
[1] Section 97-13-5 Mississippi Code of 1972 Annotated (1972)
[2] Section 97-13-13 Mississippi Code of 1972 Annotated (1972)
[3] Section 97-13-3 Mississippi Code of 1972 Annotated (1972)
[4] Section 23-5-103 Mississippi Code of 1972 Annotated (1972)
[5] Section 23-5-151 Mississippi Code of 1972 Annotated (1972)
[6] Word v. Sykes, 61 Miss. 649 (1884); Sproule v. Fredericks, 69 Miss. 898, 11 So. 472 (1892); May v. Young, 164 Miss. 35, 143 So. 703 (1932); Lopez v. Holleman, 219 Miss. 822, 69 So.2d 903 (1954); Hubbard v. McKey, 193 So.2d 129 (1966).