## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-EC-01947-SCT

*McARTHUR STRAUGHTER*

*v.*

*COBIE COLLINS*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/01/2000 |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN R. REEVES |
| ATTORNEY FOR APPELLEE: | DEREK E. PARKER |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | REVERSED AND REMANDED - 06/13/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/8/2002 |

**BEFORE SMITH, P.J., COBB AND DIAZ, JJ.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. McArthur Straughter filed a complaint in the Yazoo County Circuit Court challenging the results of the 1999 general election for Yazoo County District 5 Supervisor in which Cobie Collins defeated him by 36 votes. The complaint was brought to trial, but at the conclusion of Straughter's case-in-chief, the circuit court granted Collins's motion for directed verdict, concluding that Straughter failed to put on sufficient evidence of election fraud by Collins's workers to create a jury issue. Aggrieved, Straughter now appeals, raising the following issue:

> **WHETHER THE CIRCUIT COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR A DIRECTED VERDICT?**

¶2. Concluding that Straughter's appeal is well taken, we reverse and remand for a new trial consistent with this opinion.

## FACTS

¶3. McArthur Straughter and Cobie Collins were rival candidates for the position of Yazoo County District 5 County Supervisor. The general election was held on November 2, 1999, and the Yazoo County Election Commission certified that Collins, the incumbent District 5 Supervisor, was the winner by a margin of 36 votes. Straughter subsequently timely filed a complaint alleging that Collins caused his supporters to

intimidate voters and to coerce their votes, and that his supporters engaged in other improper acts, in violation of the Mississippi Election Code, Miss. Code Ann. §§ 23-15-1 *et seq*. (2001). Specifically, Straughter claimed that Collins caused some of his supporters to gather in large groups both outside and inside the L.T. Miller Community Center ("the Center"), which was the main polling place for District 5; that some of his supporters physically entered voting booths with voters without their permission and instructed them to vote for Collins against the voter's wishes; and that some non-resident voters were allowed to vote for Collins in the election.[1]

¶4. Straughter called nineteen witnesses during his case-in-chief. Victoria Marie Pittman testified that when she and her mother arrived at the L T. Miller Community Center polling place, four people came over to their car and a woman named Reecie snatched information on Straughter away from Pittman, and pushed Collins's literature into her hand, indicating that Straughter was "not the one to vote for." Pittman further testified that when she went inside the voting building, a woman named Purvis (who apparently was a poll worker) physically entered the voting booth with her, without being asked to do so, and began pulling the voting machine levers to vote on Pittman's behalf, selecting Collins instead of Straughter in addition to casting votes for candidates for other offices on the ballot.

¶5. Willie Earl Wright, a long-time Yazoo County employee, testified that he personally observed Collins open an absentee ballot, review the vote contained inside, and seal the ballot with a glue stick. This was done in Collins's office in the presence of Wright and four other current Yazoo County employees, at a meeting called by Collins to go over plans to get absentee ballots from the nursing home before Straughter did.

¶6. Reaver Brown, a friend of Straughter's who stayed at the Center for most of the day to observe the scene on Straughter's behalf, testified that the parking lot was crowded with cars, which he claimed was a tactic used to intimidate white voters. Brown also testified that a number of individuals not entitled to voter assistance nevertheless asked for assistance and were accompanied into voting booths by Collins's supporters.

¶7. W.C. Williams testified that a man named Robert Lee approached him and asked if he needed assistance. When he answered in the affirmative, Lee accompanied him into the voting booth. Williams testified that he told Lee to vote for Straughter, but that he did not know which lever Lee pulled, though "he pulled it twice." However, Williams's testimony conflicted with a prior statement in which he said that a man named Peter Gower entered the booth with him and definitely pulled the lever for Collins. On cross-examination, Williams stated that he had not read that statement when he signed it.

¶8. Wendy Gates testified that she came to the Center for her first time to vote, and when she arrived at the Center, a woman named Loretta Collums physically took Gates's infant child from her and accompanied her to the voting booth under the guise of assisting her. Gates testified that Collums had said she was going to help her, so when the poll worker asked if she needed help, she said Collums was "with" her and they went inside of the curtain together. She told Collums that she wanted to vote for Straughter, but she saw Collums pick Collins instead. She testified that she was upset about that, but record reflects that neither her attorney nor Collins's attorney asked her what she said or did about it.

¶9. Truvander Brown, a campaign worker for Straughter, who served as a poll watcher from noon until the polls closed, testified that three of Collins's sons and other members of Collins's family remained at the Center the entire time she was there. She said that Collins stood at the door, and she drew a sketch

showing that, in order to enter the door of the polling place, voters had to come so close to Collins, his sons and other family members that they would have to step aside to let the voters enter the door. She further testified that this was intimidating and uncomfortable.

¶10. Joe L. Berry testified that he asked for assistance at the Center because he had difficulty reading and that a woman entered the booth with him and he asked her to pull the lever for Collins. He admitted that he could not read the names of either Collins or Straughter and that he did not feel scared or intimidated.

¶11. Emma Clark, District 5 Election Commissioner, testified that she was concerned on the day of the election that some people at the Center may have been given assistance who were not entitled to voter assistance. She also testified that she attempted to give cards outlining the procedure for giving voter assistance, to the people she saw going into the polling booth with voters, but that they laughed at her, threw the cards on the ground, saying "who does she think she is?"

¶12. Thomas Jones testified that the entrance to the polling place was partially blocked, so that he had to go around people to get in, and that it was intimidating to him. He further testified that, as he entered the voting booth, a young woman came in with him and asked if he needed assistance. He described this approach as unwelcomed, intimidating, and insulting. After he declined assistance, the young woman left, and Jones cast his vote without interference.

¶13. Robert Lee, an employee of the Board of Supervisors who worked under Collins, testified that he took a vacation day from work to help with Collins's reelection. Specifically, Lee assisted two or three voters who could not read. He also testified that he assisted voters in applying for absentee ballots. Lee denied any knowledge that Collins had engaged in voter fraud by tearing up one absentee ballot and directing Peter Gower to sign another one. Lee speculated that he might have told that to Michael Jones, as a joke, while intoxicated.

¶14. Michael Jones, a campaign worker for Straughter, testified that Robert Lee told him (while not apparently intoxicated) that Lee had seen Collins tear up an absentee ballot and direct Gower to sign an absentee ballot.

¶15. McArthur Straughter himself testified that the parking lot at the Center was overcrowded, which he speculated would be intimidating to some voters. Straughter testified that he observed a significant number of persons (between twenty and twenty-five) who did not appear to be disabled or otherwise in need of voter assistance being approached by agents of Collins and asked if they needed assistance. The agent would then accompany the voter into the booth. Straughter also corroborated Michael Jones's testimony that Robert Lee had told them about witnessing Collins's destruction of a ballot. However, Straughter also admitted to being present on a number of occasions when someone filled out an absentee ballot on behalf of a voter who was paralyzed or stricken with Alzheimer's.

¶16. Peter Gower, a subordinate of Collins, admitted to assisting perhaps as many as thirty disabled and/or illiterate voters by witnessing and in some cases actually marking their absentee ballots.

¶17. Michael Griffin testified that as he was trying to vote, a young girl named Reecie entered the booth with him, that he was able to pull the lever for Straughter, that Reecie used a racial epithet against him, and that as he left, Reecie remained in the booth.

¶18. Ollie Johnson was the sister of Levi Hammond, a mentally retarded witness who was called by

Straughter but who was unable to testify coherently. Johnson testified that Levi was picked up and taken to the Center to vote. Johnson also testified that her other brother, Robert Hammond, was out of the country on the day of the election but nevertheless was marked as having voted.

¶19. Otha Grady testified that he observed Robert Lee take a completed absentee ballot to mail on behalf of one W.C. Dotts, but that Dotts's ballot was not included among the ballots counted. Grady also testified that Collins offered him a job and offered to "take care of" back fines Grady owed to the police department less than a week before trial began.

¶20. W.C. Dotts testified that some unidentified male took his absentee ballot to the polls for him but that his vote for some reason was not counted. However, on cross, he testified that a neighbor filled out the ballot for him, that his ballot did not resemble the ballots actually used in the election and that his vote would have been for Collins.

¶21. The final witness was Susie Bradshaw, the circuit clerk and voter registrar for Yazoo County, who appeared at the beginning of trial when the votes themselves were admitted into evidence and testified as to the election results at that time. Bradshaw was recalled at the conclusion of Straughter's case-in-chief, at which time she denied telling Peter Gower that he could mark ballots on behalf of absentee voters. After Bradshaw's second round of testimony, Straughter rested his case.

## STANDARD OF REVIEW

¶22. Our standard of review for cases in which a directed verdict has been granted in favor of the defendant, is as follows:

> [We] are required to consider the evidence in the light most favorable to the plaintiffs . . . giving those plaintiffs the benefit of all favorable inferences that may reasonably be drawn from the evidence. Unless the evidence is so lacking that no reasonable jury could find for the plaintiffs, the motion must be denied.

*Lewis v. Griffith*, 664 So.2d 177, 188 (Miss. 1995)(quoting *Wall v. Swilley*, 562 So.2d 1252, 1256 (Miss. 1990)). To prevail in an election challenge, the contestant must show that there were a sufficient number of illegal votes cast or legal votes not counted to change the result or to cast uncertainty upon the result so that the will of the voters cannot be ascertained before a new election can be ordered. *O'Neal v. Simpson*, 350 So.2d 998, 1012 (Miss. 1977). However, whether the number of disqualified votes is sufficient to warrant a special election depends on the particular facts of the case, specifically, the nature of the procedural requirements violated, the scope of the violations and the ratio of illegal votes to the total votes case. *Rogers v. Holder*, 636 So.2d 645, 650 (Miss. 1994). Even where the percentage of illegal votes is small, this Court will still order a new election if the illegal votes are attended by fraud or willful violations of the election statutes. *Id.* at 651.

## DISCUSSION

### WHETHER THE CIRCUIT COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR A DIRECTED VERDICT?

¶23. Straughter argues that there was enough evidence of illegal votes obtained and enough evidence to demonstrate an overall atmosphere of fraud and undue influence to overcome the motion for a directed

verdict, emphasizing the following facts brought out at trial. First, Peter Gower and Robert Lee, both current county employees, took off work on election day to campaign for Collins in his re-election bid in contravention of Miss. Code Ann. § 23-15-871 (2001). Second, voters who were not blind, disabled or illiterate were given voting assistance in contravention of Miss. Code Ann. § 23-15-549 (2001) and this Court's holding in *O'Neal v. Simpson*, 350 So.2d 998 (Miss. 1977). Third, there was a mob of Collins supporters present at the Center which served to intimidate and harass Straughter supporters. Fourth, Peter Gower admitted to helping between twenty-five and thirty elderly voters with their absentee ballots. Finally, Robert Lee allegedly misappropriated the absentee ballot of W.C. Dotts and gave it to Collins, who reviewed the contents and then destroyed the ballot.

### 1. Gower and Lee taking off election day to work on Collins's reelection.

¶24. Section 23-15-871 states in relevant part:

It shall be unlawful for any corporation or any officer or employee thereof, or any member of a firm, or trustee or any member of any association, or any other employer, to direct or coerce, directly or indirectly, any employee to vote or not to vote for any particular person or group of persons in any election, or to discharge or to threaten to discharge any such employee, or to increase or decrease the salary or wages of an employee, or otherwise promote or demote him, because of his vote or failure to vote for any particular candidate or group of candidates; and likewise it shall be unlawful for any employer, or employee having the authority to employ or discharge other employees, to make any statement public or private, or to give out or circulate any report or statement, calculated to intimidate or coerce or otherwise influence any employee as to his vote, and when any such statement has obtained circulation, it shall be the duty of such employer to publicly repudiate it, in the absence of which repudiation the employer shall be deemed by way of ratification to have made it himself. **Nor shall any employee be requested, directed or permitted to canvass for or against any candidate or render any other services for or against any candidate or group of candidates, during any of the hours within which the salary of said employee as an employee is being paid or agreed to be paid; nor shall any such employee be allowed any vacation or leave of absence at the expense of the employer, to render any service or services for or against any candidate or group of candidates, or to take any active part in any election campaign whatsoever; nor shall any employee at the expense, in whole or in part, of any employer take any part whatsoever in any election campaign, except the necessary time to cast his vote. The prohibitions of this section shall apply to all state, state district, county and county district officers, and to any board or commission and the members thereof by whatever name designated and whether elective or appointive, and to each and every one of those employed by them or any of them**.

Miss. Code Ann. § 23-15-871 (2001) (emphasis added).

¶25. Straughter argues that when Robert Lee and Peter Gower took paid vacation leave on election day to campaign for their employer, Collins, the taxpayers of Yazoo County footed the bill for their salaries. That is technically correct, but there is no evidence that the paid vacation time had not been earned, and no authority cited stating that they could not use their earned vacation time as they chose. Admittedly, this kind of situation could easily lend itself to direct or indirect coercion of an employee, which should be carefully guarded against.

¶26. Apparently no opinion of this Court has ever interpreted § 23-15-871, but an Attorney General's opinion has stated that "[a]s a general rule, public employees may engage in political activities when on personal leave, but any employee who engages in political activity proscribed by Section 23-15-871 while at work, would be subject to disciplinary action." Miss. Att'y.Gen. Op. No. 2000-0042, Warren, February 11, 2000.

¶27. We agree with this position and conclude that the statute prohibits public employees from working on behalf of a candidate while on the clock and bars employers from giving the employee additional leave time but does not limit the employee's right to spend vacation time as he wishes (absent coercion by the employer). There is no evidence that Collins coerced Gower and Lee to take time off in order to work on Collins's campaign, and no evidence that Gower and Lee were not entitled to the vacation time they took. Consequently, there is no basis for concluding that § 23-15-871 has been violated.

### 2. Voters who were not blind, disabled or illiterate given assistance.

¶28. Section 23-15-549 states:

> Any voter who declares to the managers of the election that he requires assistance to vote by reason of blindness, disability or inability to read or write may be given assistance by a person of the voter's choice other than the voter's employer, or agent of that employer, or officer or agent of the voter's union.

Miss. Code Ann. § 23-15-549 (2001). In *O'Neal v. Simpson*, this Court reiterated the strong public policy reasons for strictly enforcing § 23-15-549 by invalidating the votes of more than seventy persons who were given voting assistance without any indication that they were blind, disabled or illiterate. *O'Neal*, 350 So.2d at 1009. "The purpose for requiring a declaration by a voter to the election officials of his inability to read, his blindness or his physical disability, rendering him unable to mark his ballot is to protect the voter himself and to preserve the secrecy of his ballot." *Id.* To effectuate this public policy concern, we place the burden on voters to affirmatively request assistance if they needed assistance and forbid such assistance unless the voter falls into one of the three categories described by the statute. *Id.*

¶29. However, the case sub judice is distinguishable from *O'Neal*, in which it was undisputed that poll watchers for one candidate assisted over 100 voters, more than 70 of whom had their votes invalidated (many times larger than the margin of victory in the disputed election). *Id.* In contrast, Straughter's evidence identified only 4 specific voters who claimed that they had been offered assistance without their requesting it. Straughter also offered testimony from Robert Lee that Lee had assisted three people. While some of Straughter's witnesses (including Straughter himself) offered anecdotal evidence that a number of voters received assistance who were neither blind nor disabled, none of those witnesses could say how many of these voters were not entitled to assistance with any specificity. As Collins noted in his brief, there were "accusations of wrongdoing by nameless persons against nameless persons; nameless persons were forcing their assistance on other nameless persons, who were not entitled to assistance." We agree that such accusations, without more, cannot serve as a basis for invalidating an election.

### 3. The mob at the Center.

¶30. Several of Straughter's witnesses (again including Straughter himself) testified that a large number of

people were simply waiting around the Center, and at least one of Straughter's witnesses openly claimed that this crowd was encouraged to remain at the Center for the express purpose of intimidating white voters. However, Straughter offered no evidence in support of this theory other than the statements by some of his witnesses that they felt intimidated by the large number of Collins supporters at the scene. In any event, Straughter cites no authority for the proposition that the mere presence of a large crowd of people near a polling station is per se evidence of voter fraud. Further, there was no allegation that any of these people violated Section 23-15-895, which prohibits distribution of campaign material within 150 feet of the polling place. Given the high emotions which attend many elections, whether local, state or federal, we decline to establish the presence of such crowds, without more, as a basis for overturning an election.

### 4. Gower's actions with regard to absentee ballots.

¶31. This Court has discussed the potential problem that absentee ballots may present to the integrity of the electoral process as follow:

> As opposed to voting at the polls, in a public setting where the integrity of the election process can be ensured, absentee voting takes place in a private setting where the opportunity for fraud is greater. To ensure the integrity of the election process through absentee voting, the legislature has seen fit to provide other safeguards. These provisions are mandatory.

*Campbell v. Whittington*, 733 So.2d 820, 827 (Miss. 1999). Further:

> Under Miss. Code Ann. § 23-15-635 (Rev. 1990), the absent voter must vote his ballot in the presence of an attesting witness, place the ballot in the envelope, and sign the elector's certificate across the flap. The voter and the witness then swear that this process was followed. These safeguards are all that ensure the integrity of the absentee ballot process. If these mandates are not followed and the integrity of the absentee ballots is questioned, the absentee ballots should not be counted.

733 So. 2d at 827 (citations omitted).

¶32. This Court requires strict compliance with statutes governing absentee voting. *Lewis,* 664 So.2d at 185 (invalidating three absentee ballots delivered by town clerk to clerk's able-bodied relatives while town hall was officially closed over weekend). In *Stringer v. Lucas*, 608 So.2d 1351, 1361 (Miss. 1992), we reversed the granting of a directed verdict for failure to strictly follow the statute in regard to absentee ballots, stating:

> It is imperative that the appropriate elected officials strictly adhere to the statutes concerning absentee ballots. Recent elections appear to have had wholesale disregard for law regulating the use of absentee ballots. This Court, where called on to do so, will require strict compliance and we call on others to do likewise. A motion for directed verdict was inappropriate in the face of a wealth of statutory election violations.

¶33. However, mere technical irregularities in the casting of a ballot are not grounds for invalidation absent evidence of fraud or intentional wrongdoing. *Campbell*, 733 So.2d at 826. In *Campbell*, this Court affirmed the invalidation of twenty absentee ballots where those ballots had all been witnessed by the same person, where several voters had not affixed their signatures to the ballot (either because they were illiterate or because they were disabled), and where one voter repudiated her absentee ballot on the witness stand.

*Id.* at 826.

¶34. In the case sub judice, Peter Gower admitted to actually completing perhaps as many as thirty absentee ballots on behalf of illiterate and/or disabled voters. This clearly calls into question the integrity of these absentee ballots. Taking the reasonable inferences in the light most favorable to Straughter, a jury might have concluded that some or all of those thirty ballots should have been invalidated.

### 5. Lee's and Collins's actions.

¶35. At trial, Straughter offered testimony that Robert Lee absconded with the absentee ballot of W.C. Dotts. However, there was considerable doubt as to whether Dotts had ever actually filed out any absentee ballot. In any case, Dotts clearly stated that he intended to vote for Collins, and thus any issue of voter fraud pertaining to the Dotts ballot is moot.

¶36. Straughter and Michael Jones also testified that Robert Lee told them he personally witnessed Collins tearing up an absentee ballot in Collins' office and that he observed Collins instructing Peter Gower to sign an absentee ballot. Lee for his part denies observing any such thing. Viewing the evidence in the light most favorable to Straughter, a jury might believe Straughter and Jones over Lee and that at least one absentee vote had been illegally destroyed.

## CONCLUSION

¶37. Viewing all the evidence in the light most favorable to Straughter, we conclude that a reasonable jury could find (1) that seven votes should have been invalidated because the voters improperly received assistance at the Center, (2) that up to 30 votes should have been invalidated because they were filed out by Peter Gower, and (3) that one absentee ballot was improperly destroyed by Collins. While the number of challenged votes is only a small percentage of the total cast, a reasonable jury could conclude that the actions complained of constituted a willful violation of the Mississippi Election Code. Finally, the total number of votes which could potentially have been invalidated (thirty-eight in all) is higher than the number of votes by which Collins won the election, although this is not required in order to reverse the trial court. Under our standard of review, which strongly favors the non-moving party, the circuit court erred in granting a directed verdict. We therefore reverse the circuit court's judgment and remand this case for a new trial consistent with this opinion.

¶38. **REVERSED AND REMANDED.**

**SMITH, P.J., WALLER, DIAZ AND EASLEY, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. PITTMAN, C.J., AND McRAE, P.J., DISSENT WITHOUT SEPARATE WRITTEN OPINION. CARLSON, J., NOT PARTICIPATING.**

1. Although Straughter raised the non-resident issue in his complaint, it received only cursory attention at trial and is not raised again in Straughter's brief and is therefore waived.